L. G. Hitchcolk, B. C. Dorsey, Jake Croissant, John Stephens, Harry B. Howell, T. W. Jenks, S. H. Kyle, Harry Moulton, N. Weil, George L. Dickerson, David Berkowitz, J. E. Byrnes, A. M. Garvie, Joseph Walsh and W. A. Evans, *Appellants*, v. Mortgage Securities Corporation, a Corporation, *Appellee*.

Opinion Filed February 13, 1928.

148

*Kay, Adams, Ragland & Kurz,* for Appellants;

*Marks, Marks & Holt,* for Appellee.

CAMPBELL, Circuit Judge:

The appellants, as complainants in the court below, filed a bill in equity against the appellee and others, as respondents, and in this opinion the appellants will be referred to as complainants, and the appellee as respondent.

The bill of complaint alleges, in substance, that the respondents, B. K. Hanafourde and W. R. Carter, promoted and organized a corporation known as the Jacksonville Driving Club, to which Hanafourde assigned a certain twenty-five year lease on a certain tract of land adjacent to the Fair Ground, which he had secured from the State Fair Association in Jacksonville, Florida; that the purpose of the organization of the Jacksonville Driving Club was to build and maintain a race track; that the corporation had an authorized capital stock of fifteen hundred

(1,500) preferred shares of the par value of $100.00 each, and fifteen hundred (1,500) shares of common stock of the par value of $100.00 each; that the respondent Hanafourde claimed that he was entitled to all the authorized common stock in consideration of the assignment of his lease to the corporation, and that thereupon the entire fifteen hundred shares of authorized common stock was issued to him; that this common stock that went to Hanafourde was almost, if not entirely, bonus to Hanafourde; that by some arrangement between Hanafourde and Carter, which was unknown to the complainants, Carter claimed to have shared with Hanafourde in the common stock, and still holds a portion thereof, but upon information and belief it is alleged that Carter paid no consideration therefor to the Driving Club, to the same extent as it was in the hands of Hanafourde; that Hanafourde and Carter, in order to get funds with which to improve the grounds of the said Driving Club, covered by lease aforesaid, began a sales program for the preferred stock of said corporation, and made numerous sales; that the basis of the sale for said stock, made by Hanafourde and Carter and accepted by various subscribers, was that each purchaser of a share of preferred stock at $115.00, would be given by Hanafourde, or Hanafourde and Carter jointly, one share of common stock in the Driving Club; that the complainants, as well as some of the respondents, who purchased preferred stock, received also one share of common stock in the club; that said Hanafourde, or said Carter, or both jointly, received out of each sale the sum of $15.00; that Carter was made president of said corporation and Hanafourde was made manager thereof; that they proceeded to make large improvements upon the ground covered by the lease, with the funds derived from the sale of the preferred stock, and also incurred large debts on behalf of

the said corporation in respect to the said improvements; that the surplus of common stock which went to Hanafourde and/or Hanafourde and Carter together, other than that purchased by the complainants and others, was pure bonus stock, and Hanafourde and/or Hanafourde and Carter jointly were liable to creditors for the par value thereof, and have continued to be.

It is further set forth in the bill that an arrangement was, at the instance of Hanafourde and Carter, conceived and entered into, for the payment of the debts of the corporation (Driving Club) and providing funds for certain improvements and current bills and expenses, which are particularly set forth in paragraph III and amended paragraph IV of the bill of complaint as follows:

"Your orators would further show that just prior to November 15, 1922, various propositions had been considered and discussed for cleaning up the debts of the Driving Club so as to prevent embarrassment to the management thereof, as well as to the management of the State Fair operated in connection therewith, during fair seasons; that finally the said Hanafourde, together with the said Carter, conceived the idea of forming a pool among the then-stockholders of the Driving Club, together with such other persons as they could persuade to come into the pool, in order to raise a sufficient amount to pay off all the indebtedness of the Driving Club then existing; that a few days before November 15, 1922, the said Hanafourde and Carter, who had up to that time been managing the affairs of the Driving Club, and who had had charge of the books and accounts of the Driving Club, and who were more familiar therewith than anybody else, had a meeting with a majority of your orators, and others who later went into the proposed pool, and it was there represented at said meeting by the said Hanafourde, and vouched for by

the said Carter, that the sum total of indebtedness of the Driving Club then amounted to a little over thirty thousand ($30,000.00) dollars, and at the same conference it was represented by the said Hanafourde, and vouched for by the said Carter, that in as much as the State Fair was to be held in a few days, and the Driving Club expected to put on races in connection therewith, that it would also be necessary to raise the sum of to-wit, $6,300.00 for purses for the races, together with $700.00 for rain insurance, together with $2,700.00 for restoring the roof to the grandstand, and in addition, $3,900.00 which had theretofore been contributed by certain of the stockholders of the Driving Club, together with sums to pay for free acts, for music and for employees during the term of the State Fair; that with all of such sums included into a budget of the Driving Club the sum total would not run over $44,000.00 or $45,-000.00 at the most; that at said meeting the said Hanafourde represented and declared most positively that the total indebtedness of the Driving Club, together with the aforesaid contemplated items and expenses, did not exceed the amount stated, which declarations and assertions made by the said Hanafourde were vouched for by the said Carter, then president of the Driving Club, as aforesaid, and also indorser on a large amount of notes payable by said Driving Club. That a majority of your orators who were present at said meeting, relying upon said representations, agreed to go into and form a pool of twenty-two men, each giving four (4) notes of five hundred ($500.00) dollars each, payable six, twelve, eighteen and twenty-four months respectively, in order to provide the fund of $44,000.00, which was then represented by the said Hanafourde and Carter as aforesaid, to be amply sufficient to pay off all the indebtedness of the Driving Club, together with the purses, rain insurance, repairs on roof, and other expen-

ses contemplated in connection with the approaching fair meet. That thereupon your orators Hitchcolk and Jenks, relying upon the representations made by the said Hanafourde, as aforesaid, and vouched for by said Carter, as aforesaid, in company with the said Carter, approached others of your orators, and aided the said Carter in inducing others to become members of said pool; that as a part of the pool arrangement discussed at the meeting aforesaid it was contemplated that the 88 notes to be given would be turned over to the defendant Mortgage Securities Corporation as trustees, to which trustee payment should be made, and the trustee in turn pay off the creditors and meet the contemplated expenses aforesaid during the period of the State Fair. That as a further part of the pool arrangement and understanding, it was understood that the remainder of the preferred stock which then remained in the treasury of the Driving Club, together with the remainder of the common stock then held by said Carter and Hanafourde under circumstances, as aforesaid, should go into a common pot with the preferred and common stock already held by those members of the proposed pool already stockholders in the Driving Club, and that there should then be a redistribution of all of such common stock and preferred stock among the twenty-two men, giving to each 41 shares of the preferred stock and 41 shares of the common stock in said Driving Club; that with that understanding the 22 men hereinafter named each gave their four notes payable to the Driving Club, aggregating the sum of $44,-000.00; that as a further part of said pool arrangement, L. G. Hitchcolk, James Y. Wilson and B. C. Dorsey were selected by said pool of 22 men as a finance committee, authorized to perfect the contemplated arrangement of pooling the stock as aforesaid, together with the notes, for

the purpose of paying off the debts and meeting expenses, as aforesaid.'' (Paragraph III.)

"Your orators would further show that at the meeting aforesaid, when the representations aforesaid were made by the said Hanafourde, and vouched for by the said. Carter, your orator Hitchcolk had present A. D. McNeill, his personal attorney, upon whom your orator Hitchcolk in a way relied for guidance when undertaking to enter into such pool arrangement; that a few days after such meeting the said Carter and Hanafourde knowing that the said McNeill was the personal attorney of the said Hitchcolk, carried to Mr. McNeill a letter of direction from the Driving Club to the defendant Mortgage Securities Corporation, dated November 15, 1922, and requested Mr. McNeill to O/K the same; that the said Carter when presenting said letter had in his hands what he called a budget of the entire indebtedness of the Driving Club, and wanted the said McNeill to approve the same, composing several pages of supposed accounts of the Driving Club, the said Carter stating that it totalled about forty-seven thousand dollars, to which the said McNeill replied that he would not approve the accounts, that he knew nothing about them, and did not propose to assume any responsibility in that regard; that the only extent to which he would go was to approve the form of the proposed letter, and after making suggestions of two or three slight changes, the said McNeill placed his O/K on said letter; that the following is a copy of said letter intended to operate as written evidence of the pool arrangement which your orators and others had endeavored to enter into as aforesaid:

" 'Jacksonville, Florida, November 15, 1922.
" 'Mortgage Securities Corporation,
Jacksonville, Florida.
Gentlemen:

" 'I herewith hand you notes of certain parties, as per list attached; the notes are payable to our Club endorsed in blank, and aggregate $44,000.00

" 'With the notes is pledged certain shares of the preferred stock of this Club, but you understand this stock has not yet been paid for, and the Club is to receive payment therefor from the proceeds of the notes; the preferred stock must not, therefore, leave your possession and must not, under any circumstances, be released for circulation until the notes relating to that particular stock are fully paid.

" 'The understanding is that you are to handle and collect these notes, applying the proceeds to the payment of the attached list of Club obligations, aggregating $47,-533.35; the obligations which are designated as open for adjustment are, under no circumstances, to be paid without the further written approval of the President and Finance Committee of the Club.

" 'In as much as the said obligations exceed the face of the notes, our treasurer will, within the next thirty (30) days, deposit with you, funds sufficient to cover the differences. The consideration for your services and advances is to be obtained by you from the creditors who, we believe, have agreed to allow a discount for prompt payment of their bills.

" 'Trusting this sufficiently informs you, we remain,
" 'Very truly yours,
" 'W. R. CARTER,
" 'President, Jacksonville Driving Club.

" 'The foregoing approved by us.

" 'L. G. HITCHCOLK,
" 'J. Y. WILSON,
" 'B. C. DORSEY,
" 'Finance Committee.

" 'On behalf of Mortgage Securities Corporation, I hereby acknowledge receipt of the foregoing letter of instructions and agree to abide thereby.

" 'MORTGAGE SECURITIES CORPORATION:

" 'By————————.' "

"That the said Carter, after getting the O/K of said McNeill to said letter, as aforesaid, then brought the same to your orators L. G. Hitchcolk, James Y. Wilson and B. C. Dorsey, comprising said finance committee, who were then at the office of the Driving Club in the Mitchell Building, and showed them the O/K of the said McNeill. That as the said Carter came in your orators, members of the finance committee, as aforesaid, were just on the eve of leaving the office for the purpose of going to the fair grounds to perfect arrangements for the approaching fair. That the said Carter requested your orators, members of said finance committee to wait a minute until he could explain about McNeill's O/K of said letter in connection with said budget. That the said Carter then had in his hands said letter attached or pinned to what he represented to said finance committee was a complete budget on several sheets of paper of all the indebtedness of the Driving Club and other items which had been previously discussed at the meeting described and mentioned in paragraph III of this bill of complaint. That said Carter, having said letter attached to the so-called budget, turned the letter over and showed said finance committee the O/K of the said McNeill on the back of said letter, and stated to said finance committee, 'I have just come from A. D.

McNeill's office. You see the letter to the Mortgage Securities Corporation and the budget attached. I showed them to Mr. McNeill and told him at the time if it was all right to O/K it, as I knew Hitchcolk would not sign it until McNeill had O/Kd it.' That your orators, said finance committee, saw the O/K of McNeill upon said letter attached to what the said Carter represented was the budget of said indebtedness and all other items, as aforesaid, and then glanced at the total figures at the conclusion of the paper attached to said letter, claimed to be such budget, and while your orator Hitchcolk was doing this the said Carter further said: 'You will note that the amount is substantially the same as we agreed upon at our Sunday's meeting.' The meeting referred to in this statement by the said Carter was the meeting mentioned in paragraph III of this bill of complaint, at which meeting the said Carter and the said Hanafourde had pretended to explain what was the total indebtedness of the Driving Club, which, together with the other items mentioned in paragraph III, of the bill of complaint, would aggregate about $44,000.00. That the total of the paper presented by the said Carter to said finance committee, as aforesaid, aggregated a little more than $2,000.00 more than the amount discussed at said prior meeting. That the members of said finance committee were then stockholders and officers in the Driving Club together with said Carter, and had confidence in his representations made as aforesaid, and relied thereon as being truthful, without taking the time to examine the paper attached to said letter in detail, in order to ascertain if the same contained the items for purses, rain insurance, etc., which had been previously discussed; nor did said finance committee at that time take the precaution to call up said McNeill to ascertain if he by placing his O/K on the back of said letter, intended thereby to O/K the

paper called a budget, which said Carter then had attached to said letter. That acting upon the representations of the said Carter, as aforesaid, under the circumstances aforesaid, the members of the said finance committee, then being in haste to go to the fair grounds, as aforesaid, signed their names to said letter. That just before signing said letter said Carter was very insistent that the finance committee sign the same forthwith, he having already signed it as president of the Driving Club, he in that regard saying: 'We want to wind this thing up right away, so I can realize some funds for the fair meet.' That at the prior meeting mentioned in paragraph III of the bill of complaint all necessary items and expenses which it was contemplated would be required to conduct the approaching fair meet had been considered and in arriving at the sum total of the necessary budget. That a few days after said finance committee put their names to said letter your orators learned that the said McNeill had not O/Kd the paper attached thereto, and represented by the said Carter as being the budget agreed upon at said prior meeting, and that the said McNeill had expressly stated to the said Carter that he would assume no responsibility in regard to said budget, or what it contained, but would only go to the extent of O/K-ing the form of said letter. Your orators also learned that when the said Carter had procured the O/K of the said McNeill to the said letter that said letter was not then attached to the so-called budget. Your orators also learned after said letter was signed by said finance committee that the so-called budget which said Carter then had attached to said letter did not include $3,900.00 which had been previously advanced by members of said pool, and did not include other items of $6,300.00 for purses, or for rain insurance, or for repairs to roof, and that instead of there being a little over $30,000.00

actual debts, that there was in said so-called budget alone over $47,000.00 of debts. That before your orators, the said finance committee, learned the extent to which misrepresentation had been made by the said Carter, as aforesaid, the said finance committee, having relied upon the representations made by the said Hanafourde and the said Carter as aforesaid, and needing immediate funds for fair purposes, and believing that the pool arrangement would afford ready cash in a few days to reimburse them, gave their individual note to the Peoples Bank of Jacksonville in the sum of $4,000.00, payable in five days; that it was about the maturity of this note when your orators, including said finance committee, became aware of the extent to which misrepresentations had been made as to the indebtedness of said Driving Club, and of the fact that the said McNeill had not O/Kd said so-called budget, and of the fact that said so-called budget did not include any items for expenses aforesaid for said fair meet, and that said pool arrangement would not afford funds for that purpose, as had been contemplated at said prior meeting described in paragraph III of the bill of complaint, and as was contemplated when said finance committee signed said letter. That had your orators and said finance committee been advised truly as to the indebtedness of said Driving Club they would never have given said notes, or any of them, nor would they have entered into, or attempted to enter into, said arrangement; that had said members of said finance committee not been misled by the misrepresentations of the said Carter, as aforesaid, they would never have placed their signatures of approval upon said letter; that if the said Carter had not represented that the said McNeill had O/Kd the whole thing, budget as well as the letter, they would not have put their names thereon; that if the said Carter had not represented when

meeting the members of the finance committee that the forty-seven thousand and odd dollars included the necessary expenses for the fair meet, as aforesaid, they would not have signed said letter. That if the said Carter had not represented that it was necessary to have said letter signed and placed in the hands of the Mortgage Securities Corporation at once, so as to procure funds with which to carry on said fair meet, and meet the items discussed in said prior meeting, the members of said finance committee would not have signed said letter.

"That your orators were under no obligations to said Driving Club, nor to any of its creditors; that since the time when said five-day note matured your orators have learned that instead of the actual indebtedness of the Driving Club being $47,533.00 as of November 15, 1922, that the actual indebtedness was several thousand dollars more than that sum, and the true amount has never yet been known to your orators, though they are now informed that the total indebtedness of the Driving Club now aggregates approximately $73,000.00." (Paragraph IV as amended.)

It is further alleged in the bill of complaint that the respondent Mortgage Securities Corporation declined to act as trustee for said pool pursuant to the terms thereof, and insisted that the same be modified in material particulars, demanding that the finance committee of the said pool, and the corporation through its officers, should execute a new instrument, but that the finance committee refused to do so. In paragraph VI of the bill there is set forth the action, upon the part of the stockholders, participated in by the complainants, or some of them as follows:

"Your orators would further show that after discovery of the misrepresentations aforesaid a stockholders' meeting was had of the Jacksonville Driving Club to-wit, December 2, 1922, at which were present W. R. Carter, President; B.

K. Hanafourde, and twelve other stockholders of the Driving Club, at which said meeting your orator L. G. Hitchcolk proposed the following motion, which was passed:

" 'That a budget committee be appointed by the Chair to prepare a budget immediately covering every indebtedness of every character of the Jacksonville Driving Club, said budget to be approved by the directors of the Jacksonville Driving Club and the members of the special group of 22 men, and that this budget be substituted at the Mortgage Securities Corporation in place of the budget or statement of accounts that they now hold, and for the difference in the two budgets, which it is estimated will be about $10,000.00, that six additional men, or as many more as may be necessary be included in this special group on the same basis as the 22 men now comprising said special group.'

"That pursuant to said resolution the said W. R. Carter endeavored to get other persons to come into the pool so as to make up a sufficient amount of money or fund to pay off the indebtedness of the Driving Club, and, based upon the representations that the indebtedness of the Driving Club then aggregated about $57,000.00, he persuaded your orator Evans to give four notes for $500.00 each, and also persuaded W. H. Herndon to do likewise, which said eight notes were then placed with the defendant Mortgage Securities Corporation along with those which had been signed and placed with said Mortgage Securities Corporation by the original 22 subscribers. That the other four men proposed in said resolution were not found and never have been found, and so it is that the proposal made by said resolution has never been carried out so as to bind the two new members Evans and Herndon, nor so as to constitute a ratification or waiver by your orators of the original misrepresentations made to them as aforesaid, whereby they

were induced to go into the pool at the beginning. That none of your orators who were in the original pool, nor the two new members who came in in the manner aforesaid, ever intended or contemplated going into the pool for any other purpose or under any other condition than that the money to be derived from their notes would be sufficient to clean up the entire indebtedness of the Driving Club and put it on its feet so that it would not be embarrassed by the demands of its creditors. That such intention was at all times known to Messrs. Carter and Hanafourde and other officers of the Driving Club, as well as to the Mortgage Securities Corporation and its officers; that your orators do not regard the stock which was to be redistributed as a part of the pool arrangement as a material inducement, or of any considerable value owing to the large indebtedness then outstanding against said Driving Club.'' (Paragraph VI.)

The complainants further allege that they had never waived or ratified the misrepresentations alleged to have been made them, when they first agreed to go into the pool, and that on February 13, 1923, they made demand on the respondent Mortgage Securities Corporation for the surrender of their said notes, by letter as follows:

"Jacksonville, Florida, February 13, 1923.
"Mortgage Securities Corporation,
Jacksonville, Fla.
Gentlemen:

''The undersigned hereby demand of you the surrender unto them of the series of four notes of $500.00 each, made by them severally, with all attachments thereto, which have come into your hands as trustees under the letter of November 15, 1922, and which are the only notes executed by the undersigned to the order of the Jacksonville Driving Club,

and which are executed by the undersigned to the order of the Jacksonville Driving Club, and which were executed by the undersigned with the intention of being beneficially used for the Jacksonville Driving Club, but the considerations for which have failed, and the conditions under which they were executed have never been met and performed by the Jacksonville Driving Club, same have. never been of binding force and we are entitled to the return of same to us.

"We are handing a copy of this demand to ,the Jacksonville Driving Club.

"Yours truly,

"L. G. Hitchcolk, Geo. L. Dickerson, H. S. Moulton, T. W. Jenks, David Berkowitz, Byron C. Dorsey, J. Croissant, Jos. H. Walsh, Harry B. Howell, John Stephens, S. H. Kyle, J. E. Byrnes, A. M. Garvie, Edward Bates, Nathan Weil.

"By Kay Adams & Ragland, their Attorneys at Law."

The bill alleges further that on May 8, 1923, there was a meeting of the stockholders of the corporation held, after the president had adjourned the meeting after having ruled there was not a quorum of the stock represented; that at this meeting, which, as complainants contend, there was a quorum of the common stock represented, a resolution was adopted which provided for the appointment of a committee of three to notify the Mortgage Securities Corporation that the stockholders had determined to rescind the proposition made when the new stock was issued, and authorizing the committee to make formal demand upon the said Mortgage Securities Corporation for the surrender of the notes which were signed by the twenty-two stockholders, and the return of the additional stock to the secretary and treasurer. There is no allegation that this committee was ever appointed or functioned, nor that this respondent

Mortgage Securities Corporation had any notice of this action.

The relief prayed for in the bill is that the pool agreement of November 15, 1922, be cancelled; that the Mortgage Securities Corporation and/or the Jacksonville Driving Club be required to surrender to the several complainants the four promissory notes signed by the respective complainants, wherein the Jacksonville Driving Club is named as payee, and that the pool arrangements may, in all respects, be dissolved and declared at an end. Further prayer is made for restraining orders.

While answers were filed by several of the individual respondents, and are unnecessarily copied into the record, we have only to consider on this appeal the answer of the respondent Mortgage Securities Corporation.

In its answer the respondent Mortgage Securities Corporation specifically denies some of the allegations of the bill of complaint, among them being the allegation that it declines to accept the trust under the letter of November 15, 1922, alleging, on the contrary, that it did accept the trust and endorsed its acceptance thereon and notified the creditors of the arrangement, advising them that through this arrangement their accounts with the Jacksonville Driving Club would be paid.

It denies any knowledge of the alleged misrepresentations of Hanafourde and Carter, complained of in the bill of complaint, or of the understanding under which the complainants gave their notes, except that about November 15, 1922, it was informed that a group of twenty-two stockholders of the Jacksonville Driving Club, in order to provide funds to take care of the club's indebtedness, had given their notes, aggregating $44,000.00, to said corporation, which notes were in serial form, each series aggregating $2,000.00 face value, and that it, Mortgage Securi-

ties Corporation, had been selected to hold, handle and collect the notes and distribute the proceeds thereof.

The answer admits the receipt of the letter of November 15, 1922, signed by the Jacksonville Driving Club and approved by the finance committee of the stockholders, by and through which it, the answering respondent, was designated as the one to hold, handle and collect the notes attached, and hold the stock therewith pledged, and distribute the same as directed.

It set forth the efforts made by the respondent to carry out the trust imposed.

It admits that some time in February, 1923, demand was made by the complainants for the return of their several notes, but that it declined to return such notes, under advice of its counsel, it having accepted the trust and having advised the creditors of the arrangement, and, therefore, under the trust, representing, to that extent, the creditors to whom it was to distribute the proceeds of the notes as collected.

Other paragraphs of the answer admit, deny or explain various features of the case.

The particular paragraph of the answer which we have specially to deal with in this appeal is paragraph XII. In this paragraph the respondent Mortgage Securities Corporation claims affirmative relief, alleging the pool arrangement made between the complainants and others of the stockholders of the Driving Club, the deposit with it of the notes of the twenty-two stockholders aggregating $44,-000.00, which was subsequently made $48,000.00, for the purpose of handling and collecting and applying to the payment of the debts of the corporation, listed and attached to the letter, also its receipt of the signed pledge and certificates of stock set forth therein. It alleges its acceptance of the trust, and its entering into the discharge of its

duties thereunder in notifying the creditors of the arrangement and advising them their accounts would be paid. It further alleges that it had either collected or satisfactory arrangement had been made for the payment of all the notes so deposited with it, except those signed by the several complainants. It further alleges that the complainants had failed and refused to pay their several notes and had repudiated the same, and that it had been necessary for it to place their notes with an attorney for collection.

The relief prayed is: that the Court decree said notes of the complainants, and each of them, so held by the respondent pursuant to the letter of instructions from the Jacksonville Driving Club, dated November 15, 1922, to be valid obligations of the complainants, enforcible against them; that the Court may decree the complainants severally liable to the respondent upon their respective notes deposited with it, for the uses and purposes set forth in the letter of instruction; and that the complainants be required to pay same, together with interest thereon and the attorney fees therein provided for, at such time and in such manner as the Court may decree proper. It is further prayed that the respondent be directed as to the sale, or other disposition, of the collateral pledged with the notes, and instructed as to the disposition of the proceeds which might be derived therefrom, or from the notes. There is also a prayer for the Court to fix the compensation to which the respondent is entitled for its services.

A motion was made by the complainants to strike paragraph XII of the answer. This motion was overruled by the court below, and thereupon the complainants filed what they term a "Reply" to the answer.

This replication, or reply, covers some twenty-nine pages of the record, and contains twelve paragraphs. Upon motion of the respondent Mortgage Securities Corporation,

each paragraph of the replication, except II, III and XII, was stricken. Paragraph VI, by leave of the Court was amended, and upon motion of the respondent was also stricken.

This appeal is taken from the three interlocutory decrees of the court below, as follows:

1. The decree denying the motion of the complainants to strike paragraph XII of the answer of the respondent Mortgage Securities Corporation.

2. The decree of the court granting the respondent's motion to strike certain paragraphs of the replication of the complainants to paragraph XII of the answer.

3. The decree of the court granting the respondent's motion to strike paragraph VI of the complainant's replication to paragraph XII of the answer.

The appellants assign ten errors in the decrees rendered by the court below, the first of which is: "The court erred in denying motion of the complainant to strike the 12th paragraph of the answer of Mortgage Securities Corporation."

As already mentioned in the statement of the pleadings in this case, paragraph XII of the answer of the respondent Mortgage Securities Corporation seeks affirmative relief upon the part of the respondent. Section 3120, Revised General Statutes, provides as follows: "The answer must state, in short and simple form, any counter-claim arising out of the transaction which is the subject-matter of the suit, and may without cross-bill, set out any set-off or counter-claim against the plaintiff which might be the subject of an independent suit in equity against him, and such set-off or counter-claim, so set up, shall have the same effect as a cross-suit, so as to enable the court to pronounce a final judgment in the same suit both on the original and cross claims."

Section 3122, Revised General Statutes, provides for testing the sufficiency of an answer, or any portion thereof, which sets up an affirmative defense, set-off or counter-claim.

The complainant's motion to strike questions the sufficiency of the answer of Mortgage Securities Corporation upon the grounds: 1. That no sufficient matter is set up therein as will warrant affirmative relief. 2. Because it does not show that the Mortgage Securities Corporation is entitled to relief against the complainants, either jointly or severally. 3. Because the affirmative relief sought is to recover a money judgment against the complainants severally, and that this should be sought by a suit at law, and, 4. That the matter set up as a basis for affirmative relief is not such as would sustain a separate suit in equity.

It is contended by the complainant that only matters that are cognizable in equity, or would form a basis for an independent suit in equity, can be set up as a counter-claim. Section 3120, Revised General Statutes, provides that a respondent may ask for affirmative relief based on "any counter-claim arising out of the transaction which is the subject-matter of the suit." If the claims for affirmative relief in paragraph XII of the answer of Mortgage Securities Corporation are based upon matters arising out of the transaction which is the subject-matter of the bill of complaint, then it would seem that the answer should stand, whether the relief claimed be such as might be obtained in in independent suit in equity or not.

The bill of complaint seeks to have certain notes of the complainants to the Jacksonville Driving Club, and deposited with the respondent under a letter of instructions, approved by the representatives of the complainants, whereby the notes were to be collected by the respondent and applied in accordance with the directions contained in

the letter, cancelled and returned. It also seeks to rescind or vacate the arrangement made for pooling the stock among the complainants and some of the respondents, upon the theory that the entire transaction is void because of alleged fraud and misrepresentations by certain of the respondents. The respondent Mortgage Securities Corporation asks, in paragraph XII of its answer, that it, in its capacity as holder of the notes, for the purposes set forth in the letter of instructions to it, be granted relief against the complainants upon these notes, if they are valid obligations and properly held by the respondent.

"In equity a partial or incomplete decree will not be entered. Therefore, for the purpose of avoiding more than one suit and in order that a full, complete, effective and final decree adjusting the rights and equities of all the parties in interest may be entered and enforced, a court of equity once having assumed jurisdiction of a cause on any equitable ground will reach out and draw into its consideration and determination the entire subject-matter, bringing before it all the parties interested therein, and will retain such jurisdiction until all matters involved in the litigation between the parties or growing out of and connected with the subject-matter of the suit are finally disposed of, *even though it is thereby required to pass on strictly legal questions—questions which would be otherwise triable in a court of law—or to grant legal remedies.* (Italics ours.) 10 R. C. L. 370; Gentry Futch Co. v. Gentry, 106 So. 473, 90 Fla. 595.

"The doctrine of retaining jurisdiction to completely adjust the controversy extends to the granting of relief to a defendant, or between co-defendants. On this ground defendant may have equitable relief to which he shows himself entitled as a consequence of the relief granted plaintiff, or even in some cases where plaintiff has failed

to make out his own case. When the original bill is suffi-
cient to invoke the jurisdiction of equity, defendant has
often been accorded relief of *legal* character." 16 Cyc.
115; 21 C. J. 137. See also Southern Ferro Concrete Co.
v. Federal Terra Cotta Co., 79 Fla. 376, 84 South. Rep. 171.

"It has often been decided that any independent relief
sought by a cross-bill must be of an equitable character,
but on the other hand it has been held, *that matters purely
legal may be relied upon, and that legal relief may be
awarded upon facts growing out of or connected with the
equities of the original bill."* (Italics ours.) 16 Cyc. 333.

At page 506 of 21 C. J. the law is stated as follows: "The
court may in order to afford complete relief between the
cross-plaintiff and the plaintiff in the original bill, concern-
ing the matters set up in the original bill, consider and de-
cree upon matters alleged in the cross-bill, if germane to the
original bill, which are *cognizable at law."* (Italics ours.)
See Quick v. Lemon, 105 Ill. 578; Zollman v. Jackson Trust
& Savings Bank, 237 Ill. 290, 87 N. E. Rep. 297; 32 L. R. A.
(N. S.) 858; Story's Eq. Pl., par. 399.

In dealing with the rights of parties to a suit for the can-
cellation of instruments to have all questions that arise
growing out of the subject-matter adjudicated in the pro-
ceeding, the rule is laid down in 4 R. C. L. 517 as follows:
"Obviously a cross-bill is available to a respondent not
only for the purpose of perfecting his equitable rights, as
where he seeks the cancellation of the instrument or con-
tract sued upon, but also for the protection and, if the
circumstances warrant it, the enforcement of such of his
legal rights as may be germane to the complainant's bill.
Thus, one who fruitlessly seeks the aid of a court of equity
to secure the cancellation of notes alleged to have been
misappropriated, cannot question the jurisdiction of the
court to enter upon a cross-bill a money judgment against

him for the amount due on the notes. Even though the matters set up in the cross-bill are purely legal, the complainant having brought the appellee in equity upon matters of exclusively equitable cognizance cannot be heard to question the jurisdiction of the court over matters set up by the defendant's cross-bill. Equity having once acquired jurisdiction and having before it the proper parties, and the subject matter to enable it to do complete justice between them, will not relegate the defendant to the necessity of relitigating his rights at law.''

''One seeking the aid of a court of equity to secure the cancellation of notes alleged to have been misappropriated cannot question the jurisdiction of the court to enter upon a cross-bill a money judgment against him for the amount due on the notes.'' Zollman v. Jackson Trust & Savings Bank, *supra*.

In the test of the opinion in the case of Zollman v. Jackson Trust & Savings Bank, *supra*, the Supremen Court of Illinois says, on page 865 of 32 L. R. A. (N. S.) : ''Even though matters set out in the cross-bill were purely legal, the appellant having brought appellee into equity upon matters of exclusive equitable cognizance, she cannot now be heard to question the jurisdiction of the court of equity over the matters set up by appellee in its cross-bill. Quick v. Lemon, 105 Ill. 518, Story Eq. Pl., par. 399. It must be borne in mind that by her original bill appellant brought these notes into question and prayed for relief in respect thereto. The cross-bill therefore was germane to the original bill. Appellee on petition of appellant had been enjoined from prosecution of this action upon the notes. It would seem to be highly inequitable to require appellee to institute another action at law, merely for the purpose of obtaining judgment upon the notes, when the court of equity had before it the proper parties, and the subject-

matter to enable it to do complete justice between the parties.''

In the case of Bates v. Lanier, 75 Fla. 79, 77 South Rep. 628, we held as follows: ''Statutes of set-off, being regarded as remedial acts, tending to prevent a circuity of action and thus settle controversies speedily, are to be liberally construed.''

In the same case we said: ''Under the statute an answer in equity may, without cross-bill, set out any set-off or counter-claim against the plaintiff which might be the subject of an independent suit in equity against him, and in a suit to enforce a mortgage lien on lands, the defendant may set off a claim for moneys converted by the complainant and where the defendant shows a right to such set-off.''

In the instant case, the complainants have made their notes, which under the alleged trust agreement were deposited with the respondent to handle and collect, the subject-matter of the controversy, asking that the court declare the notes void and without consideration, and that they be returned to the respective parties. The paragraph of respondent's answer objected to contends that the notes of the complainants are valid and enforceable obligations in its hands, and asks that upon the final hearing they be declared such, and that judgments be rendered thereon, the same being past due, and repudiated and unpaid by the complainants.

If, upon the hearing on the merits in this case, the chancellor should find that these notes are valid and binding notes, then he should grant relief to the holder of the notes in the same suit, if it is entitled to relief and has, by proper pleading, prayed for such relief.

Where complainants file a bill of complaint to have their notes, held by the respondent as a trustee, declared to be void and ordered cancelled, and the respondent files answer

in which is incorporated a paragraph setting up the capacity in which it holds the notes, and that they are binding obligations, past due and unpaid, and prays that upon final hearing the notes be held to be valid obligations of the complainants, and that judgments be rendered against the respective complainants for the principal, interest and attorney fees due on the respective notes, an order of the court below denying a motion to strike the paragraph thus praying for affirmative relief, is proper.

The other errors assigned refer to the decree of the court below in striking the several paragraphs of its replication.

A replication may be filed to an answer, or the paragraphs of an answer, asking for affirmative relief. The replication, or "reply to the answer," filed by the complainant is in the nature of an answer, but only so much of it as replied to the paragraph asking for affirmative relief was authorized under the law. A replication was not authorized or required to the other portions of the answer, unless there was a special order of the judge or court requiring same. See Sec. 3121, Revised General Statutes of Florida. There was no special order of the court below requiring a replication to the entire answer. Any portion of the replication addressed to that part of the answer that did not ask for affirmative relief, was improper, and should have been stricken on motion. We shall, therefore, consider the decree of the court below striking those paragraphs of the replication which undertake to reply to, explain or take issue with the allegations of Paragraph XII of the answer of respondent.

The chancellor granted the motion of the respondent to strike all of the replication of complainant except paragraphs two, three and twelve. In other words, nine paragraphs of the replication were stricken, with leave for the complainants to amend paragraphs 4, 6, 9, and 10, within

a specified time, if they were so advised. The complainants, within the time allowed, filed an amended paragraph six of the replication which, upon motion, was likewise stricken by an order of the court. The principal contentions made in defense to the claim for affirmative relief are set forth in paragraph six and amended paragraph six of the replication. In these paragraphs it is, in substance, alleged that the Mortgage Securities Corporation had not, at the time of the filing of the replication or the amendment thereto, and had never had, the word "trust" as a part of its name; that its charter was acquired in the year 1918, and recorded in Duval County, Florida, giving the book and page of such record; that the company was organized by three persons and had only three directors; that the corporation did not, by virtue of its charter, have power and authority to exercise the trust powers provided for in Section 4185, Revised General Statutes of Florida, and particularly the eleventh paragraph thereof. It was further alleged in amended paragraph six of the replication, that the Mortgage Securities Corporation did not, after the passage of Chapter 8531, Laws of Florida, Acts of 1921, procure an amendment of its charter, or otherwise take steps to qualify itself in accordance with the Acts of 1921, so as to authorize it to exercise the trust powers specified in Section 4185, Revised General Statutes. There are further allegations in the amended paragraph six of the replication, setting forth other omissions in organization and conduct of the affairs of the Mortgage Securities Corporation, which, it is contended, would preclude said corporation from acting as trustee or assignee of the notes and collaterals mentioned in the trust agreement hereinbefore quoted. It, therefore, appears to be the contention of complainants that the respondent, Mortgage Securities Corporation, was not legally authorized to accept the trust set forth in the

letter to it from the Jacksonville Driving Club, which was approved by the "Finance Committee," representing the complainants; also, that because of this lack of authority to act as such trustee, the entire trust agreement is void. and that none of the affirmative relief asked in paragraph six of the answer could be given by the court.

Section 4183, Revised General Statutes of Florida, provides for the organization of trust companies. This statute requires, among other things, that a trust company must be organized by five or more persons, and that the word "trust" must be in the name of such company. Section 4185 of Revised General Statutes of Florida enumerates the powers of trust companies organized under Section 4183. Paragraph eleven of said Section 4185 gives a trust company the power "To be appointed and accept the appointment of assignee or trustee under an assignment for the benefit of creditors of any debtor made pursuant to any statute or otherwise." Chapter 8531, Laws of Florida, Acts of 1921, contains a further enactment touching the qualifications of trust companies.

The complainants have not, in their replication, given the charter powers granted the respondent corporation.

In testing the sufficiency of the replication to an answer, or the part of an answer asserting a set-off or counterclaim, the motion to strike is used in the same way as a demurrer to a bill of complaint, the motion admitting the allegations of the answer to be true that are properly plead.

Did the matters set up in paragraph six and amended paragraph six of the replication constitute a defense to the affirmative relief asked for in the answer? We think not.

In the first place, it appears from the replication that the respondent, Mortgage Securities Corporation, was one of the creditors of the Jacksonville Driving Club. The pro-

ceeds of the notes of the complainants and others to the Jacksonville Driving Club were to be used in paying the obligations of the club to certain named creditors, including the Mortgage Securities Corporation.

Every corporation organized under the laws of the State of Florida has certain powers, among them is the power, 3, "to make contracts and to adopt and use a common seal, and alter the same at pleasure"; also 4, "Where special provision is not made by law or otherwise, to hold, but, convey or mortgage such personal property or real estate as the purposes of the corporation may require, also to take, hold, and convey such other real and personal property as shall be necessary for the corporation to acquire in order to obtain or secure the payment of any indebtedness or liability to it." See Section 4047, Revised General Statutes of Florida.

Under the inherent powers granted Mortgage Securities Corporation by law, it had the legal right to accept the assignment of the notes of complainants and other collaterals for the purpose of handling and collecting and applying the proceeds to the payment of the assignor's indebtedness to it. Why should it not be also permitted by the agreement to apply the proceeds of the notes and collaterals to the payment of others in like situation to whom the assignor was indebted?

"It may be stated in general terms that whoever is capable of taking the legal title or beneficial interest in property, may take it in trust for others. Whatever persons or corporations are capable of having the legal title or beneficial interest cast on them by gift, grant, bequest, descent or operation of law, may take the same subject to a trust and they will become trustees." Perry on Trusts and Trustees, Sec. 39.

Under the heading "Holding as Trustee" we find, in

14A. C. J. page 514, par. 2402, the following: ''It was for-
merly held on technical grounds that a corporation could
not hold lands to the use of another; but this doctrine has
long since been abandoned, and it is now settled beyond any
question that a corporation has not only the power or
capacity but also the right, to hold real or personal prop-
erty in trust, in the same manner and to the same extent as
a natural person, for any purpose which is not foreign to
the objects for which it was created, and that a court of
equity will enforce the trust. *And it has been held that,
where property is devised or granted to a corporation
partly for its own use and partly for the use of others, the
right of the corporation to take and hold the property for
its own use carries with it, as a necessary incident, the
power to execute that part of the trust which relates to
others.*'' (Italics supplied.)

While, as we have said, the replication is silent as to the
charter powers of the Mortgage Securities Corporation, it is
presumed that it acted within its granted powers when it
accepted the assignment of the notes and collaterals in
trust for itself and other creditors named.

''The principle is well settled that a corporation is pre-
sumed to act within its granted powers until the contrary
is shown, and that the burden of proving a contract *ultra
vires* is upon the party alleging the fact.'' 3 Thompson
on Corporations, Sec. 2779.

Where a corporation, organized and doing business under
the laws of the State of Florida, accept the trust imposed
upon it by an assignment of notes payable to, and the cer-
tificates of stock of, a debtor corporation, with the direc-
tion that the proceeds thereof be applied to the payment
of the indebtedness of the debtor corporation to said
assignee or trustee corporation, as also the indebtedness
due other creditors named in the list attached to the assign-

ment or trust agreement, such acceptance of the particular trust does not constitute the assignee corporation a "Trust Company" as provided for in Section 4183, Revised General Statutes of Florida, or in Chapter 8531, Laws of Florida, Acts of 1921. And the acceptance of such trust for the purposes stated is not *ultra vires,* as being unauthorized under the law.

In the second place, we think that the motion to strike paragraph six and amended paragraph six was properly granted, even if the acceptance by the Mortgage Securities Corporation of the trust set forth in the pleadings was *ultra vires.* The complainants, having entered into this trust agreement, would be estopped to set it up as a defense to the affirmative relief prayed for in the answer.

"No body of persons acting as a corporation under this chapter shall be permitted to set up the want of legal organization as a defense to an action against them as a corporation, nor shall any person sued on a contract made with a corporation, or sued for an injury to its property or a wrong done to its interests, be permitted to set up want of such legal organization as a defense." Sec. 4115, Rev. Gen. Stat. of Fla.

At page 324 of 14A C. J., it is said: "The majority of jurisdictions support the rule that an *ultra vires* transaction when executed by one of the parties may become enforceable by estoppel." In support of this proposition, the text writer refers to McQuaig v. Gulf Naval Stores Co., 56 Fla. 505, 47 South. Rep. 2. In the case cited we said, speaking through Mr. Justice WHITFIELD, the following: "When a contract made by a private corporation is not forbidden by law and has some relation to the business the corporation is authorized to do, such contract may not be repudiated at pleasure to the injury of one who in good faith dealt with the corporation."

A party to a corporate transaction *ultra vires* the corporation may be estopped to deny its validity by reason of the performance of the transaction by the corporation and his having received the benefits thereunder. The other party to the corporate transaction may also be estopped by reason of the fact of his dealing with the corporation knowing that it had no power to enter into the transaction. See 14A C. J., page 330, par. 2172.

In the case of So. Life Ins. & Trust Co. v. Lanier, 5 Fla. 110, we said: "A party cannot avoid his contract with a corporation and thereby diminish the fund which was designed as a security for the benefit of the public, upon the pretense that there was some abuse of the corporate powers, or mismanagement on the part of the Board of Directors in making the contract."

In the next place, if we should assume that the trust agreement, entered into by the Mortgage Securities Corporation, is *ultra vires,* it could not be set up as a defense to the affirmative relief claimed by the respondent, for the reason that *ultra vires* transaction of a corporation cannot be set up collaterally by individuals, but such transactions must be attacked directly by the State.

"A contract with a corporation may be binding on the parties, though it be an abuse of corporate powers for which the corporation may be answerable to the government which created it." So. Life Ins. & Trust Co. v. Lanier, *supra.*

"A most important doctrine connected with the validity of corporate transactions, and one which rises above the mere principle of estoppel, is that whether a corporation has acted without authority or has abused its authority or has acted in contravention of law, cannot be set up collaterally by individuals, but can be set up only by the State in a direct proceeding for that purpose." 14A C. J., page

335, par. 2178, also page 515, par. 2403. See also 3 Thompson on Corporations, Secs. 2840 and 2843; Vidal v. Girard, 2 How. (U. S.) 127, 11 L. Ed. 205; Wade v. American Colonization Society, 15 Miss. 663, 45 Am. Dec. 324; So. Life Ins. & Trust Co. v. Lanier, *supra*.

Furthermore, it appears from the prayer for affirmative relief that the respondent asked the court to decree what it should do with the notes and certificates of stock, and the proceeds of notes already collected by it, if it was held by the court that the trust was improperly granted to it.

If the trust was properly created, it would not fail because the trustees named could not act. See 14A C. J., 575. For this reason also the allegations of the paragraphs of the replication under consideration were insufficient to constitute a defense to the answer praying for affirmative relief.

We have considered the questions raised under the assignments of errors questioning the order of the court below in striking the other paragraphs of the replication to paragraph twelve of the answer of respondent, but we have found no reversible error.

Each of the interlocutory decrees of the court below from which appeal was taken, is affirmed.

Affirmed.

Ellis, C. J., and Whitfield, Terrell, Brown and Buford, J. J., concur.

Strum, J., not participating.