ANDREW J. PEMBROKE, and CLARA S. PEMBROKE, his wife, *Appellants*, v. THE PENINSULAR TERMINAL COMPANY, a Florida Corporation, *Appellee*.

146 So. 249.

En Banc.

Opinion filed January 16, 1933.

*R. J. O'Donnell, Worth W. Trammell* and *O. D. Batchelor,* for Appellants;

*S. P. Robineau* and *Garland M. Budd, Jr.,* for Appellee.

BROWN, J.—This is an appeal by the defendants in the court below from an order sustaining a motion interposed by the complainant to strike that portion of the defendant's answer which alleged grounds for affirmative relief.

The complainant, the Peninsular Terminal Company, filed its bill in the Circuit Court for Dade County to foreclose a purchase money contract. The bill alleged that the complainant was the owner in fee simple of Lot 19 of Block 1, according to a designated and duly recorded plat of the Harbor Terminal Property of the Peninsular Terminal Company, and that on February 24th, 1926, the complainant and defendant entered into a sales contract with defendant Pembroke, attached as an exhibit to the bill, whereby the complainant, for and in consideration of a cash payment of $3,300.00, and the execution by the defendant of three notes for $3,300.00 each, payable six, twelve and eighteen months after date, bearing interest at seven per cent. payable semi-annually, sold said lot to the defendant under certain restrictions set out in the contract, and agreed to make and deliver to defendant a good and sufficient warranty deed of conveyance to said land upon the payment of the balance due as represented by said three notes. That the first and second of said promissory notes, together with interest thereon, had been paid; but that the defendant had failed to pay the last of said notes, which became due and payable August 24th, 1927. The bill was filed July 20th, 1928. It alleged performance of all provisions of the contract on the part of the complainant and that complainant stood ready, able and willing to convey said land by good and sufficient warranty deed to the defendant upon his compliance with the contract; that the defendant's wife claimed some interest in the land, and was therefore made a party defendant. The bill prayed that the defendants be decreed to pay to the complainant

the amount found by the court to be due it, and that in default of such payment all the right, title and interest of defendants be sold to satisfy the balance so found to be due.

The answer of the defendants admitted substantially all the factual allegations of the bill except those setting up the complainant's ownership of the land in fee simple, and that it was able to convey the fee therein, by good and sufficient warranty deed, to the defendant, Andrew J. Pembroke, unencumbered.

That portion of the answer which was stricken made certain allegations hereinafter referred to, and prayed that the contract be rescinded, held void and of no effect, and that the defendants be held entitled to recover from complainant all moneys paid to it thereunder, with interest. The allegations of the answer upon which this prayer was predicated were, briefly stated, as follows: That the real estate described in the bill is a part of a tract of what was, on August 6th, 1920, submerged bay bottom land, under the navigable waters of Biscayne Bay, to which the complainant claims title by virtue of a deed made to its immediate grantor, the Alton Beach Realty Company, on August 6th, 1920, by the Trustees of the Internal Improvement Fund of the State of Florida, and which was in turn conveyed to the complainant by deed dated April 18th, 1921, both deeds having been duly recorded. That complainant does not have or claim title through any other source. The answer then attacks the validity of the complainant's title upon the following grounds:

(1) That the conveyance to the complainant's grantor was made by the Trustees of the Internal Improvement Fund by virtue of the authority vested in them by Chapter 7304 of the Acts of 1917, being Sections 1061 and 1062, *et seq.*, of the Revised General Statutes of 1920, and now appearing as Section 1391 and 1392, *et seq.*, of the Compiled.

General Laws of 1927. It is contended that these statutes are void, because, firstly, they are unconstitutional, and secondly, they are void as being in conflict with the trust under which the State held these lands for the use of all the people of the State for purposes of navigation, fishing and other useful purposes afforded by the waters covering them in common to and for all the people of the State; thirdly, because they are in conflict with the paramount jurisdiction of the Federal Government over navigable waters.

(2) That if the said sections of the statutes be valid, the deed from the trustees was and is void because, at the time said deed was made, the area in question was submerged "practically throughout its entirety" to a greater depth than three feet at high tide by the navigable waters of Biscayne Bay, in spite of the preamble in the deed which recites that the lands conveyed are lands "upon which the water is not more than three feet deep at high tide and which are separated from the shores by channel or channels not less than five feet deep at high tide;" that there were at the time of the conveyance, no appreciable areas within the boundaries attempted to be defined upon which the water was not more than three feet deep at high tide, thus rendering the deed void *in toto*. (It does not appear to be directly alleged that this particular lot, purchased by appellant, was situated on land which was covered by more than three feet of water at high tide at the time of the conveyance by the Trustees.)

(3) That if the said statutes and Trustee's deed be valid, the complainant cannot convey an unencumbered title, because of the general power of the Federal Government to remove obstructions to navigation which have been constructed in or over navigable waters; and for the further reason that in the permit to construct the island, issued to complainant by the Secretary of War, on April 17th, 1924,

granting authority, *inter alia,* "to excavate an area at the entrance to Miami Harbor, Florida, approximately to rock bottom, to construct a levee, bulkhead and wharf; to dredge a channel and turning basin; to dredge and fill two ship basins, and to deposit the dredged material in an area westerly and southerly of the United States Property at Miami Beach," there was incorporated a paragraph providing ,"That if future operations of the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of War, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of War, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy and unobstructed." Defendants allege that this permit from the Secretary of War, under which this tract of submerged land was bulkheaded and filled in (and subsequently platted into blocks and lots as the "Commercial Subdivision of the Harbor Terminal Property of the Peninsular Terminal Company)" was a mere license, revocable at the will of the Secretary of War.

In his order striking those portions of the answer above summarized the learned chancellor embraced an opinion in which he clearly and concisely stated his views on the questions raised, as follows:

1. "That the Chancellor to whom this cause was submitted, by reason of his continuous residence in Miami, Florida, since 1897, should take judicial notice of well known physical changes that have occurred in Biscayne Bay during said period; that two causeways have been constructed across said Bay connecting the City of Miami with the City of Miami Beach; and that various islands have

been constructed in the Bay and connected with the said two causeways, which said islands have been improved by the construction of paved streets, by planting trees and shrubbery, and by the erection of numerous buildings now occupied by the owners as residences.

2. "That the said two causeways and islands have been constructed under circumstances similar to the island upon which the lot in question is located, and that the possession, title, and ownership of such parties will be affected by the decision in the present case.

3. "That Defendants are estopped, by reason of their contract to purchase the lot in question, from disputing the title and ownership of Complainant in the lands upon which foreclosure is sought by Complainant's Bill.

4. "The Court being of the opinion, for the purposes of this case, that the title and ownership of the land in question should rest upon a grant, and not upon an evidentiary fact, finds that the deed from the Trustees of the Internal Improvement Fund to the purchasers of the submerged lands in Biscayne Bay, upon which the island now in question was constructed, was and is an adjudication that such submerged lands were of the kind and character contemplated by Section 1386, *et seq.,* Compiled General Laws of Florida, 1927; and that all requirements of law were complied with on the part of the Trustees and the purchaser before such deed of conveyance was executed and delivered.

5. "That from and after the execution and delivery of such deed, and the construction of the island upon the submerged lands embraced within the said deed, that the State of Florida, acting through the Trustees of the Internal Improvement Fund, and all other persons, are estopped from asserting any right or claim to the lands embraced within

the limits of such island as sovereignty. lands incapable of being reduced to private ownership. But on the contrary, the Court holds that under such circumstances the grantee in such deed, and the successors in title, become the *bona fide* owner, or owners, of such real property in like manner and under the same circumstances as the purchasers of other state lands.

6. "It appears from the Answer that a permit was obtained from the War Department of the United States Government to construct the island in question. It may be fairly assumed, that before such permit issued, plans and specifications of the proposed improvement were submitted to the proper officers of the Federal Government, and that such plans and specifications would show that the improvement contemplated was a permanent improvement, was not an obstruction, and was for the benefit of commerce and navigation. The United States, having no claim of title to submerged land, and having control only of the surface of the waters of the harbor, and having granted the permit, notwithstanding the reservation contained therein as alleged in the Answer, would likewise be estopped from demanding the removal of the island as an obstruction to navigation, and would be without authority to interfere with the possession of the owners except by condemnation proceedings, or in case of military necessity, with due compensation to the owners."

The chancellor's opinion plainly shows the gravity and importance of the questions involved in this case. Whether his conclusions, and the order made in pursuance thereof, were sound in law, it is now our task to consider. The mere importance of the case does not affect the application of legal principles. In determining these questions, grave and far reaching as they may be in their effect upon the

titles to other properties, we must of course, "hew to the line" of the law as we find it and understand it to be, as applied to the property and the questions involved in this particular case, "let the chips fall where they may." But in the decision of any particular case, the courts must be careful to act in accordance with sound legal principles, so that the particular decision will not only correctly define and apply the law to the particular case, but will also furnish a safe and just precedent and guide to be followed in similar cases which may arise in the future. There is food for thought, for courts as well as individuals, in Kant's categorical imperative: "Act on a maxim which thou canst will to be law universal." We will in this spirit now proceed to examine the questions here presented in the order in which they are stated in our summary of appellant's answer.

I. The first contention of the appellant is that Sections 1391 and 1392, Compiled General Laws, derived from an Act adopted in 1917, are void by reason of being (1) unconstitutional and (2) in conflict with the trust doctrine frequently enunciated by this Court, citing Broward v. Mabry, 58 Fla. 398, 50 So. 826; State v. Gerbing, 65 Fla. 603, 47 So. 353; Merrill-Stevens Co. v. Durkee, 62 Fla. 549, 57 So. 428; Brickell v. Trammell, 77 Fla. 544, 82 So. 221; Deering v. Martin, 95 Fla. 224, 116 So. 54. These two questions are somewhat interrelated in appellant's brief and may be considered in connection with each other.

Those sections of the Act of 1917 here under attack are set forth in the Compiled General Laws of 1927 (Sections 1391-2) and are also copied in full in the opinion written for this Court by Circuit Judge Campbell in the case of Deering v. Martin, on pages 229-230 of 95 Fla., and on page 57 of 116 So.

So far as the Constitution of this State is concerned, as was pointed out by this Court, speaking through the ma-

jority opinion written by Mr. Justice ELLIS in the case of State ex rel. Buford v. City of Tampa, 88 Fla., 196, 102 So. 336, "There is no provision in the Constitution of this State expressly or impliedly forbidding the Legislature to dispose of submerged lands lying between high and low waters mark, nor declaring any trust in the State in its tide waters, nor the submerged lands that may be subject to overflow at high tide." This case was followed in the recent case of Tampa Northern R. Co. v. City of Tampa, 140 So. 311, decided March 17th, 1932, wherein the special Act granting the fee simple title to the City of Tampa in certain submerged lands in Hillsborough Bay and Hillsborough River, which was held valid in the case above quoted from was again brought in question. These cases would seem to be conclusive of the question of the constitutionality of the statute so far as the State Constitution is concerned.

But appellants further contend that the statute violates Section 2 of the Declaration of Rights contained in our State Constitution, which declares that "the paramount allegiance of every citizen is due to the Federal Government." The words quoted, as they appear in the Constitution are immediately followed by the words, "and the people of this State have no power to dissolve its connection therewith." This clause made its first appearance in the Constitution of 1868, which was adopted during the reconstruction period. Its purpose was evidently to settle, by constitutional mandate, the great controversy over the question of whether a State had the right to secede, which question had apparently been settled by the arbitrament of war. So, under historical conditions which it is not necessary now to discuss, this clause was inserted in the Constitution of 1868, so as to make it certain that the people of this State should never again have, or claim, the right to meet in convention assembled and adopt an ordinance of secession, dissolving

the connection between the State and Federal Governments. This was the evident purpose and intent of this clause and though it was carried forward into the Constitution of 1885, it is practically innocuous for any other purpose. The argument of appellants is that this clause is equivalent to a declaration that the Federal Constitution, and the valid laws enacted by Congress in pursuance thereof, are in full force and effect in this State. This, they admit, would be true without such clause. The Federal Constitution and the laws enacted in pursuance thereof, within the powers delegated to the Federal Government by the Constitution, are of course, by the very words of the Federal Constitution as originally adopted, "the Supreme law of the land." The argument then proceeds that the State Constitution having made this express declaration, the State Legislature is inhibited from passing any law contravening a Federal law, and that when the statute here in question was adopted there was in effect in this State not only the commerce clause of the Federal Constitution, giving complete jurisdiction over all the navigable waters of the State, but the Federal statute of March 3rd, 1899, whereby the Federal Government actually assumed such jurisdiction, and that therefore the Florida Legislature had no authority to pass the statute here under attack, authorizing the sale of land under navigable waters, and that such statute is void, as being in conflict with the Federal Constitution and an Act of Congress passed under its authority. This contention, as applied to the State statute here under review, as we understand its purpose and scope, is not sustained by the decisions of this State, nor by those of The Supreme Court of the United States.

Those sections of the Federal Act of March 3rd, 1899 (which was an appropriation Act covering many pages) which are referred to in the briefs, and which are the only

sections of that Act which appear to have any bearing on the questions now before us, are Sections 9 and 10, which will be found in U. S. Stat. at large p. 1151; U. S. Code Anno., 377, 397; U. S. Comp. Stat., Sections 9971, 9910; and read as follows:

"Sec. 9. That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided,* That such structures may be built under authority of the Legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War.

"Sec. 10. That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port,

roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure, within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

The power of Congress to pass such a statute rests upon the commerce clause of the Federal Constitution, embraced in Section 8 of Article I, and which reads as follows: "The Congress shall have power * * * to regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." The Tenth amendment to that Constitution provides that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

While the commerce clause of the Federal Constitution has proven to be a vital and far-reaching provision, yet, as was said in Deering v. Martin, *supra,* in the concurring opinion by the writer, "Federal control of navigable waters is limited in its scope, and leaves much of the authority of the States thereover untouched." This is all the more true as to the lands under such waters, as has been made plain by many decisions of this Court. Thus, in State ex rel. Ellis, v. Gerbing, 56 Fla. 603, 47 So. 353, 22 L. R. A. (N. S.) 337, this Court, speaking through Mr. Justice WHITFIELD, said:

"The original thirteen States that formed the Federal Union as the United States of America, were distinct and independent sovereignties, and as such severally owned and held in trust for the whole people within their respective borders, the navigable waters in the States and the lands thereunder including the shore or land between high and low water marks. Proprietary rights in the lands of this character within the States were not passed to the United States by the Federal Constitution under which the Union was founded, and no power to dispose of such lands was delegated to the United States, therefore all proprietary rights in and power to dispose of lands under navigable waters in the States including the shore between high and low water marks were reserved to the States severally or to the people thereof. The powers of the United States as to matters of navigation; interstate and foreign commerce, post roads and eminent domain are not pertinent here.

"The navigable waters in the States and the lands under such waters including the shore or lands between ordinary high and low water marks, are the property of the States or of the people of the States in their united or sovereign capacity, and are held not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use of all the people of the States respectively, for purposes of navigation, commerce, fishing and other useful purposes afforded by the waters in common to and for the people of the States. The title to the lands of this character were withheld by the original States of this Union as essential to the sovereignty of the States, to the welfare of the people of the States and to the proper exercise of the police powers of the States. A State may make limited disposition of portions of such lands or of the use thereof in the interest of the public wel-

fare, where the rights of the whole people of the State as to navigation and other uses of the waters are not materially impaired. The States cannot abdicate general control over such lands and the waters thereon, since such abdication would be inconsistent with the implied legal duty of the States to preserve and control such lands and the waters thereon and the use of them for the public good."

\* \* \*

"After the United States acquired by treaty of cession from Spain the territory known as East and West Florida, such territory was held subject to the Constitution and laws of the United States. The lands under navigable waters including the shores were held by the United States for the benefit of the whole people to go to the future State for the use of the whole people of the State."

\* \* \*

"The admission of the State of Florida 'into the Union on equal footing with the original States, in all respects whatsoever,' gave to the State of Florida all rights and powers as to property and sovereignty possessed by the original States of the Union, except such as were withheld by the Act admitting the State.

"Among the rights thus acquired by the State of Florida is the right to own and hold the lands under navigable waters within the State including the shores or space between ordinary high and low water marks, for the benefit of the people of the State, as such right is as essential to the sovereignty, to the complete exercise of police powers and to the welfare of the people of the new States as of the original States of the Union. Shivley v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep. 548; Mobile Dry Docks Co. v. Mobile, 146 Ala., 198, 40 South Rep. 205, 9 Am. and Eng. Anno. Cas. 1299."

In Deering v. Martin, *supra,* it was held that the trust doctrine, with reference to lands under navigable waters, cannot, on principle, be carried to such an extent as to preclude the State from transferring to private ownership limited portions of such lands when the rights of the people of the State are not invaded or impaired.

Of course, the title of the State to such submerged lands is held subject to the paramount power of Congress under the Constitution to regulate interstate and international commerce, and navigation necessary thereto, and when any portions of such lands are conveyed by the State, they must necessarily, by operation of law, be conveyed subject to such Federal power. This is well known and well settled law, and hardly calls for any citations of authority. This principle is recognized by many of our own decisions, as well as those of the Supreme Court of the United States. See State ex rel. Buford v. City of Tampa, *supra;* Freed v. Miami Beach Pier Corp., 93 Fla. 888, 112 So. 841, 52 A. L. R. 1177, and other Florida cases hereinabove cited. In I Farnham on Waters, Section 11, it is said: "It being established that the title to the waters, and land covered by them, is in the State, they form part of its domain, and its laws are binding thereon, except insofar as they conflict with laws enacted by Congress within the limits of the constitutional authority of that body." And the State not only has the power to grant lands under tide waters, which was in England vested in the Crown, but also the additional power which was vested in the Parliament, which represented the people. 1 Farnham on Waters, sec. 44. This has been recognized by the Federal courts. Thus it was held, in Shively v. Bowlby, 152 U. S. 1, 14 S. C. 548, 38 Law Ed., 331, that upon the American Revolution all the proprietary rights of the Crown and of Parliament in, and their dominion over, land under tidewater, vested in the sev-

eral States, subject to the powers surrendered to the national government. This holding is cited with approval in the opinion in Appleby v. New York, 271 U. S. 364, 70 L. Ed., 992. In the opinion in the Shively case, after making a summary of the laws and decisions of the various States, Mr. Justice GRAY said:

"The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tidewaters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another."

In discussing this question, this Court in Deering v. Martin, *supra,* said:

"Section 1062 indicates that the power vested by Section 1061 should not be exercised on objection made when it would interfere 'with the rights granted to riparian owners' by the laws of Florida, or would be a serious impediment to navigation of public fisheries.' In such a case, no doubt, the board should decline to sell, even in the absence of formal objection.

"It is not my purpose to contend that the trust doctrine, with reference to lands under navigable waters in this State, would preclude the State from transferring to private ownership limited portions of such lands when the rights of the people of the State for which the State holds the title in trust are not invaded or impaired. And such must have been the intent of the statute. This principle is recognized by our decisions, including those cited in Judge Campbell's

opinion. It is also recognized by the decisions of the Supreme Court of the United States.

"In Farnham on Waters, p. 173, the author says that this doctrine, together with its limitations, was very fully and adequately stated by Justice Field in Illinois Central R. Co. v. Illinois, 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018. The learned Justice therein said:

" 'The State holds the title to the lands, under the navigable waters * * * in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein free from the obstruction or interference of private parties * * *. The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between the grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled.' "

This general subject is quite thoroughly covered in the opinion by Mr. Chief Justice TAFT in the case of Appleby v. New York, *supra*, cited in Deering v. Martin, *supra*. In that case it was held that the power of a State and one of its municipalities to part with property under navigable waters to private parties, free from the State's subsequent

regulatory control of the water over the land, and the land itself, is governed by the law of the State as derived from statutes and decisions in force when the proprietary grant is made, and creates a vested right in the grantee, even though such grant is subject to the paramount right of the Federal Government to control navigation, and that the subsequent exercise of the Federal power in the interests of navigation over the waters covering such lands does not revest the State or its municipality with any of the proprietary or regulatory powers which it had parted with by its grant. This Court has also recognized the vested and irrevocable quality of a grant of tide lands by a municipality under legislative authority, in a case where the lands had actually been filled in and improved. Tampa Northern R. Co. v. City of Tampa, *supra*. See also Rivas v. Solary, 18 Fla. 122, as to the character and extent of the State's proprietary interest in lands under a navigable river, and its power to grant a good title to the same. In this connection, see Bolsa Land Co. v. Burdick, (Cal.) 90 Pac. 532, 12 L. R. A. (N. S.) 275. In Donnelly v. United States, 228 U. S. 243, 57 Law Ed. 820, it was held that what shall be deemed navigable water, within the meaning of local rules of property, in the bed of a stream, is for the determination of the several States. See also North Shore, etc., Co. v. Nicomen Broom Co., 212 U. S. 406, 53 L. Ed. 574. As to what are "navigable waters of the United States," see Leovy v. U. S. 177 U. S. 621, 44 Law Ed. 914, which holds that this term has reference to commerce of a substantial and permanent character; a continuous highway, navigable in fact, over which commerce is carried on with other States or foreign countries, U. S. v. The Montello, 20 Wall 430, 22 L. Ed. 391; a part of a continuous highway for interstate and foreign commerce, Perry v. Haines, 191 U. S. 17, 24 S. C. 8, 48 L. Ed. 73. A permit from the Secretary of War

amounts to no more than a certificate from that department that the proposed construction will not interfere with navigation in interstate or foreign commerce. Thus it was held that a permit by the Secretary of War for the construction of a tunnel under the Hudson River merely expressed the assent of the Federal Government so far as concerned public rights of navigation. Sullivan v. Booth, 206 N. Y. S. 260, 210 App. Div. 347. And a permit from such authority does not give the party to whom it is issued the right to construct a wharf over submerged lands not owned by him. Cobb v. Lincoln Park Comm'rs. 67 N. E. 5, 202 Ill. 427; 63 L. R. 264. Congress may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation, or appropriateness to that end. United States v. River Rouge Imp. Co. 269 U. S. 411, 70 Law Ed. 339. This was the holding in a case where the Federal Government brought condemnation proceedings against the owners of numerous parcels of riparian land deemed necessary to the making of certain river improvements.

There is a clear field for the operation of both the State statute here assailed and the Federal Act of March 3rd, 1899. One provides for selling and conveying through the Trustees of the I. I. Fund the title of the State to lands of a certain character located under tidal waters in the State, with the right of the grantee to bulkhead and fill in the same, provided the rights of riparian owners are not impaired, and no serious impediment to navigation or public fisheries is created, and the other, the Federal statute, in effect, provides that no structure can be built under such State grant in such waters unless the consent of the Federal Government, expressed through its duly constituted officials, is first obtained. There is no such direct or essential conflict between the two statutes as to render the State statute invalid

or void. The State merely provides for the granting of certain of its lands under tidal waters, which lands the grantee of course takes subject to whatever paramount power the Federal Government has over such waters. So, in order to fill in and improve such submerged lands the grantee must obtain both the State's authority and title and the Federal Government's consent. Thus there is over such lands a species of concurrent power and jurisdiction, resulting from our dual system of government. This is illustrated by several decisions of the Supreme Court of the United States.

In Cummings v. Chicago, 188 U. S. 140, 47 L. Ed. 525, it was held that the authority of the State of Illinois to prohibit the erection, without its permission, of a structure in a navigable river, located wholly within that State, was not superseded by Section 10 of said Federal Act of March 3rd, 1899, although Congress had made an appropriation for the improvement of the river, and under the latter congressional Act the river had been surveyed and improved and lines had been established beyond which no structure should be erected without the approval of the Secretary of War.

The case of Montgomery v. City of Portland, 190 U. S. 89, 47 L. Ed. 965, involved a very similar question to that presented in the Cummings case. In the Montgomery case, Mr. Justice HARLAN, speaking for the Court, referring to the Cummings case, said:

"In that case we recognized the doctrine as long established that the authority of a State over navigable waters entirely within its limits was plenary, subject only to such action as Congress may take in execution of its power under the Constitution to regulate commerce among the several States. After referring to Lake Shore and M. S. R. Co. v. Ohio, (1897) 165 U. S. 365, 366, 368, 41 L. Ed. 747,

748, 17 Sup. St. Rep. 357, we said that if Congress had intended by its legislation, prior to that decision, 'to assert the power to take under national control, for every purpose, and to the fullest possible extent, the erection of structures in the navigable waters of the United States that were wholly within the limits of the respective States, and to supersede entirely the authority which the States, in the absence of any action by Congress, have in such matters, such a radical departure from the previous policy of the Government would have been manifested by clear and explicit language. In the absence of such language it should not be assumed that any such departure was intended. We do not overlook the long-settled principle that the power of Congress to regulate commerce among the States 'is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.' Gibbons v. Ogden, 9 Wheat, 1, 196, 6 L. Ed. 23, 70; Brown v. Maryland, 12 Wheat, 419, 446, 6 L. Ed. 678, 688; Brown v. Houston, 114 U. S. 630, 29 L. Ed. 260, 5 Sup. Ct. Rep. 1091. But we will not at this time make any declaration of opinion as to the full scope of this power, or as to the extent to which Congress may go in the matter of the erection, or authorizing the erection, of docks and like structures in navigable waters that are entirely within the territorial limits of the several States. Whether Congress may, against or without the expressed will of a State, give affirmative authority to private parties to erect structures in such waters, it is not necessary in this case to decide. It is only necessary to say that the Act of 1899 does not manifest the purpose of Congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the States. The effect of that Act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a State, depend

upon the concurrent or joint assent of both the national Government and the State Government. The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot be erected by them. But under existing legislation they must, before proceeding under such an authority, obtain also the assent of the State acting by its constituted agencies."

See also Wisconsin v. Illinois, 278 U. S. 367, 73 Law Ed. 426.

. To sum up, the general principle, supported by the weight of authority in this country, is that, subject to the paramount authority of Congress over interstate commerce and the navigable waters of the United States, and subject also to vested private property rights, a State has full power to legislate concerning the disposition and use of navigable waters and the lands thereunder which are within the territorial limits of the State, even where such waters connect with waters outside such limits; subject to any prohibitions or limitations upon the exercise of such power which may be contained in the State Constitution. See 45 C. J. 421, 547, and 1 Farnham on Waters, 212 *et seq.* While our State Constitution contains no prohibitions or limitations upon the exercise of such power, this Court, as shown by the cases herein cited, has held that the legislative power is limited by the trust doctrine hereinabove discussed. Even if it should be conceded that the Legislature of this State has the power to set aside such trust doctrine, a question which is not here necessary for us to decide, we hold that said statute of 1917 (Sections 1391 *et seq.* C. G. L.), properly construed, is not in conflict with such trust doctrine pertaining to the lands under the navigable waters of this State. This holding is fully supported by the many cases decided by this Court

construing the riparian rights Act of 1856 (Chapter 791, Acts of 1856, Secs. 1772-1773 C. G. L.), and the Act of 1921 (Chapter 8537) re-enacting the Act of 1856, so as to make it apply to riparian proprietors owning lands extending to high water mark, and adding certain additional provisions (see Section 1774 *et seq.* C. G. L), as well as by State ex rel. Buford v. City of Tampa, *supra*; Tampa Northern R. Co. v. City of Tampa, *supra*, and Deering v Martin, *supra*. The Acts of 1856 and 1921 divest the State of its title to lands covered by water, lying in front of upland owned by any citizen holding title to high water mark of "any navigable stream, or bay of the sea, or harbor, as far as the edge of the channel," and vests the title to the same in such riparian proprietors for certain named purposes, such as the building of wharves, and filling up from the shore as far as may be desired, not obstructing the channel, etc. See Panama Ice & Fish Co. v. Atlanta & St. Andrews Bay R. Co. 71 Fla. 419, 71 So. 608; Thiesen v. G. F. & A. R. Co. 75 Fla. 28, 78 So. 491; Commodores Point Terminal Co. v. Hudnall, 283 Fed. 150, 178. The Act of 1921 embraces the words, "subject to any inalienable trust under which the State holds such lands," which were not in the older Act. These Acts, together with the Act here under attack, evidence a public policy established under legislative authority, beginning as far back as 1856, under which the State may part with the title to certain portions of its lands under navigable waters, of the kind and under the conditions described in the statutes, which policy and authority cannot be lightly disregarded by the courts. But, so far as the Act of 1917, here under review, is concerned, this Court held in the Deering v. Martin case that the Trustees could be enjoined by a court of equity, in a suit brought by a proper party, from selling and conveying, when to do so would transcend the power granted by the statute and

would interfere with the rights granted to riparian owners by the State; and the writer is inclined to the view that the cited case holds that such action could be enjoined at the suit of a taxpayer when the proposed grant would create a serious impediment to navigation or public fisheries, or when to do so would be to "invade the rights of the people of the State for which the State holds the title in trust." However, in that case, this Court quoted with approval an extract from the opinion by Justice FIELD in Ill. Central R. Co. v. Illinois, *supra*, wherein it was said that, "The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining." This passage was also quoted by Chief Justice TAFT in Appleby v. New York, *supra*, as a generally recognized exception to or modification of the trust doctrine.

Our conclusion therefore is that Chapter 7304 of the Acts of 1917 (Section 1391 *et seq.*, C. G. L.) is a valid Act, and is not in conflict with the State or Federal Constitutions, nor with the congressional Act of March 3rd, 1899 (Sections 9 and 10), nor with the trust under which the State holds the title to lands under navigable waters. If there should be any attempt, in the administration of that Act, to impair the rights of riparian proprietors, or the rights of the people of this State under the trust doctrine, such proposed action by the Trustees could be enjoined at the suit of a proper party under the principles laid down in the case of Deering v. Martin, *supra*. So much for the validity of the statute.

2. We come now to the second line of attack on the validity of complainant's title, as made by the answer, which is hereinabove summarized, and which is grounded upon

the allegation that the deed from the Trustees is void and ineffectual because, it is averred, the area in question was submerged "practically throughout its entirety" to a greater depth than three feet at high tide, in spite of the fact that the deed from the Trustees erroneously or falsely recited that the lands conveyed were lands "upon which the water is not more than three feet deep at high tide" and were "separated from the shores by channel or channels not less than five feet deep at high tide."

. The deed thus attacked was made by the Trustees of the I. I. Fund on August 6th, 1920. The answer of appellants making this attack was filed over eight years later, in November, 1928. Neither the Trustees nor the State were parties to this suit, which was a suit between private parties, begun by appellee in July, 1928, to foreclose a vendor's lien for the balance of purchase money due on a sales contract made in February, 1926.

. It may be that the facts thus alleged in the answer would, if true, have afforded ground for a bill in equity to enjoin the Trustees from selling and conveying such lands, under the principles laid down in the Deering case, but, as here presented, in a suit between private parties, eight years after the Trustees had acted and made the deed, and after the land had been converted into an island by bulkheading and filling in, it amounts to a collateral attack upon the validity of the action taken by an official public body charged with the duty of determining certain facts before acting, which in our opinion is not allowable. As was pertinently observed by the learned chancellor in his opinion, "the title and ownership of the land in question should rest upon a grant, and not upon an evidentiary fact."

By the statute (Sec. 1391 *et seq.* C. G. L.) it is provided that:

"1391. The title to all islands, sand bars, shallow banks or small islands made by the process of dredging of the channels by the United States Government located in the tidal waters of the counties in the State of Florida, or similar, of other islands, sand bars and shallow banks upon which the water is not more than three feet deep at high tide and which are separated from the shore by a channel or channels, not less than five feet deep at high tide, or sand bars and shallow banks along the shores of the mainland in which the title is not, at this date, invested in prior parties, is hereby invested in the trustees of the internal improvement fund of the State of Florida, to be held by the State of Florida, and disposed of as hereinafter provided.

"1392. The said trustees shall have power to sell and convey the islands and submerged lands hereby granted upon such prices and terms as they shall see fit, after giving notice by publication in a newspaper published in the county seat of the county in which such islands or submerged lands are located not less than once a week for four consecutive weeks in order that any persons who have objections to such sale may have opportunity to present the same, and if no objections are filed within the said thirty days, the trustees shall have authority to consummate such sale. If objections are filed, the trustees shall hear and consider the same and if it shall appear that the sale of such islands and submerged lands and their ownership by private persons would interfere with the rights granted to riparian owners by the laws of Florida, or would be a serious impediment to navigation or public fisheries, it shall be the duty of the trustees to withdraw the said lands from sale.

"1393. It is expressly provided that nothing herein contained shall be so construed as to deprive any private riparian owner from bringing an injunction suit in equity against such sale on the ground that he would be thereby deprived

of his riparian rights granted to him by law: Provided, that such suit must be commenced within thirty days after the trustees shall have overruled the objections of such owner to such proposed sale.

"In case suit is brought by any private owner to enjoin such sale, it shall be in the discretion of the trustees to defend such suit or to withdraw said lands from sale.

"1394. In case any such islands or submerged lands are sold by the trustees according to the provisions of sections 1391 and 1392, the purchaser shall have the right to bulkhead and fill in same as provided by Section 3869, without, however, being required to connect the same with the shore or with the permanent wharf."

Thus it became the duty of the Trustees of the I. I. Fund to give notice by publication, to hear and consider objections, and to determine the facts upon which the statute conditions their power to sell and convey. The recitals in the deed made by the Trustees in this instance shows that they found and determined the facts to be that the lands in controversy were under water not more than three feet deep at high tide and were separated from the shore by a channel or channels not less than five feet deep at high tide, and were such lands as they were, by the statute, vested with the State's power to sell and convey. And, as pointed out in the Deering case, it was the intent of the statute that it should also be their duty, whether objections were made or not made, not to sell and convey if to do so would "interfere with the rights granted to riparian owners by the laws of Florida, or would be a serious impediment to navigation or public fisheries."

The presumption is that the Trustees, being public officials of the State, complied with their duty under the law, and that they correctly ascertained the facts warranting

their action. This presumption is to all intents and purposes a conclusive one when attempted to be put in issue by a collateral attack in a suit between private parties; especially a suit to which neither the Trustees nor the State were made parties, and brought eight years after the action was taken and the deed executed, during which period the lands involved had been filled in and made into an island, and platted into blocks, streets and lots, no doubt at great expense to the State's grantee, the Alton Brock Realty Co., or its grantee, the appellee here.

, Furthermore, by an act passed in 1925, Chapter 10162 of the Laws of Fla. (Sec. 1395 C. G. L.) it appears that all sales and conveyances of this character which had been made by the Trustees under the above statute, were confirmed and validated, with certain exceptions not here applicable.

If the deed of the Trustees made under the statute could be thus attacked in a suit between private parties eight years after it was executed, it could be done eighteen, or more years thereafter, at which time it might be very difficult, it not impossible, to secure definite and reliable evidence as to just what the depth of the water was over the land in question at the time the conveyance was made, and before it was filled in and improved. It would certainly be a dangerous and unsound public policy to make the validity of land titles dependent upon the ability of those collaterally attacked or defending such titles to produce evidence of this character to defeat or sustain a deed made by the Trustees under the State's authority.

The Supreme Court of the United States has held, in quite a number of cases, that the United States alone can object to the want of authority of a national bank to accept a conveyance of real estate in trust, or to loan money upon

a mortgage taken on real estate as security; that the validity of the instrument can only be assailed in a direct proceeding brought for that purpose. This line of cases is cited in Luria v. Bank of Coral Gables, 142 So. 901. One of them is Kerfoot v. Farmers & Merchants Bank, 218 U. S., 281, 54 Law Ed. 1042, in which Mr. Justice HUGHES, writing the opinion, said:

"This rule, while recognizing the authority of the government to which the corporation is amenable, has the salutary effect of assuring the security of titles and of avoiding the injurious consequences which would otherwise result. In the present case a trust was declared, and this trust should not be permitted to fail and the property to be diverted from those for whom it was intended, by treating the conveyance to the bank as a nullity, in the absence of a clear statement of legislative intent that it should be so regarded."

The Federal courts hold that the decision of the Land Department upon questions of fact is conclusive on the courts; that the courts will not entertain an inquiry as to the extent of the investigation by the Secretary of the Interior and his knowledge of the points involved in his decision as to a contest in the Land Department, nor as to the methods by which he reached his determination, De Cambra v. Rogers, 189 U. S. 119, 23 S. C. R. 519, 47 L. ed. 734. A patent for public lands regularly issued by the officers of the Land Department cannot be attacked collaterally, but only in a direct proceeding instituted by the government or by those acting in its name and by its authority, though if the department issues a patent, under mistake of law, to one not entitled to it, a court of equity will correct the error by requiring a transfer of the legal title to the true owner. But in proceedings required for the alienation of public lands, in the absence of fraud or imposition, the action of the depart-

ment upon matters of fact cognizable by it, is conclusive and cannot be collaterally impeached. Lee v. Johnson, 116 U. S. 48, 6 S. C. R. 249, L. Ed. 570; Sanford v. Sanford, 139 U. S. 642, 11 S. C. R. 666, 35 Law Ed. 290; Sontewall Phosphate Co. v. Peyton, 39 Fla., 726, 23 So. 440. See also Daniels v. Wagner, 237 U. S. 547, 35 S. C. R. 740, 59 L. Ed 1102, holding that the courts will not review findings of fact by the Land Department which it was within its province and duty to make. Nor are government surveys of public land subject to collateral attack in actions between private parties. Horne v. Smith, 159 U. S. 40, 15 S. C. R. 988; 40 L. Ed. 68. Only the State can raise the question of forfeiture of a grant of tide lands. 1 Farnham on Waters, 232; White v. Nassau Trust Co., 168 N. Y. 149, 61 N. E. 169. As to collateral attack generally, see also Van Fleet on Collateral Attack, 87, 861; State v. City of Sarasota, 92 Fla. 563, 109 So. 473; West v. Town of Lake Placid, 97 Fla. 127, 120 So. 361; Fiehe v. Householder Co. 93 Fla. 627, 125 So. 2; Hitchcolk v. Mortgage Securities Corporation, 95 Fla. 147, 116 So. 244.

The proper execution of the trust imposed in the State of Florida by the Federal Act vesting in the State title to swamp and overflowed lands for certan purposes cannot be questioned by a private party; nor is the reasonableness of the area embraced in legislative grants for railroad rights of way open to judicial review. Seaboard Air Line R. Co. v. Board of Bond Trustees, 91 Fla. 612, 108 So. 689.

The courts will not interfere with the administration of the Internal Improvement Fund by the State officials designated by the statute as Trustees of such fund, when acting within the scope of their statutory authority, unless the Constitution is being violated or private rights invaded contrary to law and equity. Everglades Sugar & Land Co.

v. Bryan, 81 Fla. 75, 87 So. 68; Hardee v. Horton, 90 Fla. 452, 108 So. 189.

Original actual surveys of public lands by the United States government, on the faith of which property rights have been acquired, control over surveys subsequently made which affect such rights, as between parties to an action of ejectment involving such lands. Kelsey v. Lake Childs Company, 93 Fla. 743, 112 So. 887. See also, as to the controlling effect of a survey made under state authority to locate the line of ordinary high water mark on navigable bodies of water, the case of Martin v. Busch, 93 Fla. 535, 112 So. 274.

We think that the general principles underlying the above cited authorities sustain our conclusion that the allegation in the appellants' answer attacking the validity of the deed from the Trustees of the Internal Improvement Fund to appellee's grantor on the ground that the area conveyed was at the time of the conveyance submerged practically throughout its entirety to a greater depth than three feet at high tide, amounted to a collateral attack upon the grant made by said Trustees, which was not permissible, either as a defense, or as a ground for affirmative relief, in this suit between private parties.

3. The last ground upon which appellants in their answer in the court below, base their prayer for affirmative relief is set forth in the summary of such answer already made in the first part of this opinion. It is in substance that the complainant in the court below could not, as required by the contract, convey a good and unencumbered fee simple title because the Trustee's deed was made subject to the paramount power of the Federal Government over navigable waters, which includes the power to remove obstructions which have been constructed in such waters, even when made

with the permission of such government, and that the permit granted by the Secretary of War to complainant's grantor was a mere license, revocable at the will of the Secretary of War, or his successors in office, rendering the island subject to removal without compensation upon the order of the Secretary of War. That therefore the title continues to be subject to the dominant easement of the Federal Government for the benefit of navigation, and hence there is no assurance of any definite tenure.

The answer does not allege that the plans and specifications for the construction were not submitted to and recommended by the Chief of Engineers and approved and authorized by the Secretary of War prior to the commencement of the construction, as required by the Act of Congress, but counsel for appellant insist that the permit from the Secretary of War was a mere license, revocable at the will of the Secretary of War. On the other hand counsel for appellee contend that the permit granted by the Secretary of War, under the act of Congress hereinabove quoted, as pertains to a structure or construction of this permanent nature, is more than a mere license revocable at will, that it granted complete authority to construct the island, and that the clause in the permit which is construed as a power of revocation applied to the dredges, pipe lines, trestle-work and other constructual devices necessary to the construction of such a project, which would necessarily be located in the waters of the bay outside the area which was permitted to be filled in, and did not apply to the permanent island itself. There is considerable force in this suggestion. But as we view this question, we do not deem it material to ascertain just what the Secretary of War intended by the language used in this connection, which is quoted in the earlier portion of this opinion. In so far as this clause of the permit may have exceeded the authority vested in Secretary of

War by Section 10 of the Act of March 3rd, 1889, it would be void and of no effect. But whether he had or had not embraced this clause in his permit, the construction thus permitted would have remained subject to the well known paramount power of Congress over navigable waters and structures erected therein, lawfully and reasonably exercisable in the interests of navigation. The appellant, when he purchased a lot on an island constructed in the waters of Biscayne Bay, was chargeable with notice of that power (3 Farnham on Waters, 2217), and cannot complain of its existence any more than he could complain of the existence of the State's power of eminent domain. Neither power invalidates the fee simple title in the land. But we concur in the contention of appellee that the scope and effect of the Secretary of War's permit, so far as the island constructed under it is concerned, must be construed in the light of the power delegated to that official by the Act of Congress of March 3, 1899, and that, so construed, it is more than a mere license, revocable at the arbitrary will of the officer who granted it. The language of the so-called revocable clause of the permit itself indicates this, whether it be construed to apply to the island or the structural devices used in making it. The clause says, "That if future operations of the United States Government require an alteration in the position of the structure or work herein authorized, or if in the opinion of the Secretary of War, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required, upon due notice from the Secretary of War, to remove or alter the structural work or obstruction caused thereby without expense to the United States, so as to render navigation reasonably free, easy and unobstructed."

As we have seen, these submerged lands were conveyed by the Trustees of the I. I. Fund of the State of Florida,

under legislative authority, to the appellee's grantor. This deed conveyed the legal title, subject of course to the State's police power and to the paramount power of Congress over navigable waters, and this deed from the State carried with it the right under the statute to bulkhead and fill in said lands. So the grantee acquired by this deed from the State (so far at least as the right of private parties to question it is concerned) a good fee simple title to the submerged lands, with the right under the State statute to fill in and improve them. Biscayne Bay lies entirely within the boundaries of the State of Florida, but it is used, or the channels therein are used, in carrying on interstate and foreign commerce. So we have no doubt that the power of Congress over navigable waters attached to the waters involved in this case. Appellee's grantor having received a good title from the State, with the right to bulkhead and fill in the same, all that was necessary to complete that right was to obtain the authority of the Federal Government, and the method of doing so was prescribed by Section 10 of the Act of Congress of March 3, 1899. If, as its language indicates, Section 9 of this Act be construed to apply only to "any bridge, dam, dike, or causeway," over or in navigable waters of the United States, it appears that Section 10 of that Act would apply to any other "structure" in such waters, and would be the section which controls in this case. This section provides that "it shall not be lawful" to build any "structure" in any such waters, "except on plans recommended by the Chief of Engineers and authorized by the Secretary of War." The fair construction of this section is that, if such recommendaton and authority be secured, the structure thus authorized would be *lawful* under this Act of Congress. This section of the Act does not contemplate the granting by the Secretary of War of mere licenses, revocable at will, in cases of this nature. It may be, and probably is, the case,

that the Congress cannot directly, or through power delegated to the Secretary of War, entirely divest itself of the continuing power vested in it by the Constitution in behalf of commerce and navigation, and that even though its consent be given directly or through the Secretary of War, to the making of a structure of any sort in navigable waters, it may subsequently by appropriate proceedings and the payment of just compensation secure the removal of such structure, if the interests of commerce and navigation imperatively demand it. This is about all that the so-called revocable clauses in the Secretary of War's permit can legally amount to. The State's police power may also extend just as far. The State, for instance, cannot divest itself of the power of eminent domain. All property in the State is acquired and held subject to the due exercise by the State of its police power. Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 So. 68, 81; Hardee v. Horton, 90 Fla. 452, 108 So. 189. But it does not follow that permanent structures, such as islands, made with the authority of both the State and Federal Governments, can subsequently be taken and removed by either of such governments, even if the public interests require it, without due process of law and paying just compensation therefor. Both the State and Federal Constitutions provide that private property shall not be taken for public use without just compensation.

In support of its contention that the Secretary of War's permit for the construction of the island in question here was a mere license, revocable at will, and such official could at any time require the removal of the island without compensation to the owner, appellant cites two decisions of the Supreme Court of the United States. One of them is the case of Louisville Bridge Co. v. United States, 242 U. S. 409, 61 Law Ed. 395. In that case, it was held that a bridge company, which had erected a bridge over the Ohio River

under authority of a special Act of Congress, which contained no reservation, was not given an irrepealable franchise to maintain its bridge precisely as originally constructed, and was not entitled to compensation in case Congress should thereafter require changes to be made in the interests of navigation, and that the declaration by Congress in the original Act that the bridge when constructed should be a lawful and a post route, was impliedly repealed by Section 18 of the Act of March 3, 1899, to the effect that whenever the Secretary of War finds any bridge theretofore or thereafter constructed over any of the navigable waterways of the United States to be an unreasonable obstruction to free navigation, it shall be his duty, after hearing, to take action looking to the removal or alteration of the bridge, so as to render navigation reasonably free, easy and unobstructed. But it should be noted that Section 18 of the Act of March 3, 1899, by its express terms, applies only to bridges, and is not applicable to the facts involved in the case at bar. In the opinion in the cited case it was said that "It may be conceded that the declaration of Congress in the Act of 1865 that the bridge was a lawful structure was conclusive upon the question until Congress passed some inconsistent enactment. As was said by Mr. Justice NELSON, speaking for the Court in the Wheeling Bridge case, 18 How. at p. 430, 15 Law Ed. 436, although it may have been an obstruction in fact, it was not such in the contemplation of the law. But Section 18 of the 1899 Act wrought a change in the law." It may be, that in view of said Section 18, some such reservation as that contained in the permit in question here would have been appropriate if incorporated in a bridge building permit, but it does not appear to have been authorized under Section 10 of the Act of 1899, under which the Secretary of War must have acted in granting the permit for the construction here involved. When he granted the

permit and authorized such construction under Section 10, he exhausted his delegated authority, except to see to it that the structure made under such permit was built in accordance therewith, and when so builded, it became, by virtue of the Act of Congress, a lawful structure, and one that could not be arbitrarily ordered to be removed by the Secretary of War or by Congress itself, without just compensation to the owner. Such is our understanding of the effect of the decisions of the Federal Supreme Court, some of which will be adverted to presently. That this is the proper construction of Section 10 of the said Federal Act is further indicated by Section 12 thereof, which provides penalties for the violation of Sections 9, 10 and 11 (which last section deals with establishing harbor lines beyond which certain structures may not be extended), and which provides further that the removal of structures erected *in violation* of said Sections 9, 10 and 11 may be enforced by injunction of any circuit court exercising jurisdiction in any district in which such structures may exist. This necessarily implies that structures as the island here in question *made in compliance* with Section 10 are recognized as lawful and not subject to removal by injunctive process. It must be remembered that the Federal Supreme Court has recognized the right of Congress to delegate the power to the Secretary of War which is delegated to that office by said Section 10, and that when he acts *in pursuance of the power thus delegated,* it is the Congress acting through him, and he has no power to repeal or revoke such action.

The other case relied on by appellant is Sanitary District of Chicago v. United States, 266 U. S. 405, 69 L. Ed. 352. It is true that in that case, Mr. Justice HOLMES, writing the opinion, said that the various permits which had been granted by the Secretary of War were in their nature "revocable licenses." But this language must be interpreted

in the light of the unusual and peculiar facts of that case. The holding in that case in this respect, as expressed in the 12th head note, was that "The temporary license granted by the Secretary of War to the City of Chicago, between 1899 and 1913, to withdraw waters from Lake Michigan, does not estop the United States from forbidding further withdrawals to such extent as to affect the level of the Lake." A reading of the opinion shows that during the period mentioned, the Secretary of War granted various permits, as to the amount of water which could be withdrawn from the lake through the channel which had been made by the City to dispose of its sewage, some of them raising and some of them lowering the volume of flowage from the Lake, each of such permits being made subject to modification or revocation. The matter being dealt with was more or less conjectural and experimental. Finally the City applied for a permit to be allowed to withdraw 10,000 cubic feet per second. This application the Secretary of War refused, on the ground that it would so lower the level of the lake as to injuriously affect navigation. The City claimed that, under State law, it had the right to withdraw the amount applied for, and filed its bill to enforce that supposed right, which litigation thus begun finally reached the Federal Supreme Court, which decided the case adversely to the City's contentions. It was in this connection that the court held the various permits, temporary in their nature, to be no more than revocable licenses, and not of such a character as to estop the Federal Government from exercising its power to protect the navigability of Lake Michigan. We do not question the correctness of that decision, but the facts of that case were utterly different from the facts in the case at bar, and the decision in that case does not, in our opinion, afford authority for the contention that the permit granted by the Secretary of War in this

case amounted to no more than a mere license, revocable at will. In the course of the opinion, Mr. Justice HOLMES, adverting to general principles, says: "A state cannot estop itself by grant or contract from the exercise of the police power (Citing authorities). It would seem a strong thing to say that the United States is subject to narrower restrictions in matters of national and international concern." While this observation might not have been necessary to the decision of that case, we are not inclined to challenge the views so expressed, especially as applied to the facts of that case. The power and duty of the Federal Government to protect interstate and foreign commerce is in the nature of a police power, and even if the Secretary of War had erred in his calculations and permitted Chicago to take so much water from the lake as to injure its navigability, when this was shown by actual experience, the Federal Government would doubtless not have been estopped from taking such action to limit the volume being taken to such an amount as the interests of commerce and navigation made imperatively necessary; and that, too, without payment of compensation to the City.

In both of the above cases, compensation was denied. In the Louisville Bridge case, the case of Union Bridge Co. v. United States, 204 U. S. 364, 51 Law Ed. 523, was cited. It was held in that case that the expense occasioned by alteration of a bridge under Section 18 of the Act of March 3rd, 1899, was not a taking of private property for public use, but was merely *incidental* to the exercise by the government of its power to regulate commerce. It was recognized in that case that if in the exercise of such power the Government found it necessary to actually *take* private property for public use, "it must obey the constitutional injunction to make or secure just compensation to the owner." It was also said that: "If the means employed

have no real substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action. The authority of the courts to interfere in such cases is beyond all doubt. Minnesota v. Barber, 135 U. S. 313, 320, 34 L. Ed. 455, 458, 10 S. C. 862." In the Chicago Sanitary District case, above discussed, it is plain that the City of Chicago had secured no vested right to lower the level of Lake Michigan to the point where it would impair its navigabiilty; that it was not the intent of the permits issued to it to grant any such right, and that certainly the State had no power by itself to confer any such right. So there was no taking of private property in that case. Another case or group of cases, growing out of this controversy reached the Federal Supreme Court. See Wisconsin v. Illinois, 278 U. S. 367, 73 Law Ed. 426. In that case, it was held that both State and Federal approval was necessary, and in discussing Section 10 of the Act of 1899, it was said that "the true intent of the Act of Congress was that unreasonable obstructions to navigation and navigable capacity were prohibited, and that in the cases described in the second and third clauses of Section 10, the Secretary of War, acting on the recommendation of the Chief of Engineers, was authorized to determine what in the particular cases constituted an unreasonable obstruction."

In Osborne & Co. v. Missouri Pac. R. Co. 147 U. S. 248, 37 L. Ed. 155, it was held that where there is no direct *taking of the estate itself,* under the power of eminent domain, and the injury complained of is the injection of damage in the enjoyment thereof, a court of equity must be satisfied that the threatened damage is substantial and

the remedy at law inadequate before it would restrain the progress of a public work.

The case of Monongahela Navigation Company v. United States, 148 U. S. 312, 37 L. Ed. 463, involving the taking of actual property, a lock and dam belonging to the Navigation Company, which had been erected by it in the Monongahela River with the authority of both the State and the Federal Governments. It was held in that case that the right of the National Government to condemn and appropriate this lock and dam was subject to the limitation imposed by the fifth amendment to the Federal Constitution, that private property shall not be taken for public use without compensation, and that such compensation required the Government to pay not only the value of the tangible property but also the value of the owner's franchise to collect tolls which had been granted by the State that Congress has supreme control of the regulation of commerce, but if in exercising that control, it deems it necessary to take private property, then it must proceed subject to the limitation imposed by the fifth amendment and can take only on payment of just compensation.

In the case of United States v. Lynah, 188 U. S. 445, 47 L. Ed. 539, it was held that the turning of a valuable rice plantation into a valueless bog, as the result of an improvement in navigation undertaken by the United States Government, amounted to a taking of the land itself within the meaning of the fifth amendment, and that the Government was therefore compelled to make just compensation for such appropriation of the land to public use, and that this right could not be defeated merely because such land was taken by the Government in the exercise of its power to improve navigation.

See also in this connection Pumpelly v. Green Bay and M. Canal Co. 13 Wall, 166 20 L. Ed. 557; United States

v. Cress, 243 U. S. 316, 61 L. Ed. 746; United States v. River Rouge Improvement Co. 269, U. S. 411, 70 L. Ed. 339.

While the general rule is that a state, or a municipality as its agent, cannot by grant or contract estop itself from the reasonable and necessary exercise of the police power (Denver & Rio Grande R. Co. v. Denver, 250 U. S. 241, 63 L. Ed. 958), it was held in Appleby v. New York, 271 U. S. 364, 70 L. Ed. 992, that, where the law of the State permits it, the State may by its deed of land under tidal water, with the right of the grantor to fill it, part with its power to regulate the navigation of water over such land in such a way as to interfere with its ownership and enjoyment by the grantee. The case of Tampa Northern R. Co. v. City of Tampa, 140 So. 311, has some bearing on this question; also Rivas v. Solary, 18 Fla. 122.

In the light of these cases, it is hardly conceivable that either the Federal or State Government would have the right to take, or require the removal, without compensation, of all or any part of an island, such as the one here involved, constructed on submerged land in Biscayne Bay under a grant from the State and with the authority and approval of the Federal Government. Even if the future developments and needs of commerce and navigation should imperatively require such a taking by the Federal Government of a structure thus builded—a structure or a permanent character, lawful when made—surely the owner or owners would be entitled to just compensation under the fifth amendment to the Federal Constitution.

It thus appears that, simmered down to its residuum of legal effect, the facts alleged in that portion of the answer upon which the prayer for permanent relief was predicated, shows that the appellant's vendor, the appellee here, held

a fee simple title to the land in question, subject only, at most, to the police power of the State, and the paramount power of Congress under the commerce clause of the Federal Constitution. Both of these powers, State and Federal, are governmental in their nature. Indeed, all lands and structures located in or bordering upon. navigable waters in this State are held subject to the due and proper exercise of these powers, and when the appellant purchased the land in question he was chargeable with notice of these governmental powers. 3, Farnham on Waters, 2217; Maupin on Marketable Title, Third Ed. Sec. 85 and 85a. Marshall v. Hartman, 139 So. 441. He is presumed to have purchased with knowledge of the law. Steinhardt v. Consolidated Grocery Co. 80 Fla. 531, 86 So. 431.

The question then arises, did the existence of these powers of the Federal and State Governments constitute such an incumbrance upon the property purchased by appellant from appellee as to justify appellant in attempting to obtain a rescission of the contract of purchase and the recovery back of that portion of the purchase money already paid? We think not.

In Wheeler v. Sullivan, 90 Fla. 711, 106 So. 876, this court speaking through Mr. Justice STRUM, said:

"The contract here sued upon is executory. That being the case, the settled rule is that unless excepted by such contract of sale, or the restrictive covenants be properly released, or the objection duly waived by the vendee, covenants imposed by the vendor or a predecessor in title, restricting the use which may be made of the premises, are such incumbrances as entitle the purchaser to perform, unless such covenants require no more than the law would compel the vendee to do, or refrain from doing, as the case may be, independently of contract. (Citing authorities.)"

"Reasonable restrictions of the character referred to when imposed by public authority through a valid exercise of the powers of government are not usually regarded as an incumbrance within the meaning of the rule above stated. Lincoln Trust Co. v. Williams Building Corp. 169 N. Y. Sipp. 1045; 183 App. Div. (N. Y.) 225; 229 N. E. 313; 128 N. E. Rep. 209. See also Carbonier v. Arbona, 68 Fla. 194, 67 South. Rep. 41."

In McCaskill v. Union Naval Stores Co. 59 Fla. 571, 52 So. 561, it was held that provisions of law applicable to the subject matter of contracts, are parts of the contracts, whether so expressed or referred to in the contract or not. See also Leusman v. Kyle, 121 So. 464, 97, Fla. 465, and cases therein cited.

In Richardson-Kellett Co. v. Kline, 70 Fla. 23, 69 So. 203, it was held that, in a conveyance of certain lands in the Everglades, a reservation of a right in favor of the State to construct a drainage canal through the land would not be a breach of a covenant against encumbrances; the right in question being secured to the State by a public statute. As having some bearing on this question, see also James v. Gollnick, 100 Fla. 829, 130 So. 450.

Section 143 of Maupin on Marketable Title, Third Edition, reads as follows:

"The covenants of warranty and for quiet enjoyment do not embrace acts of sovereignty, such, for example, as the exercise of the right of eminent domain. The organic law of each State provides that private property shall not be taken for public purposes without compensation, and the covenantee is protected by provisions for the indemnity of the owners of the appropriated lands made in pursuance of this law. When the parties enter into covenants for title it will be presumed that they had in view only existing rights under

a paramount title, and the power of the State to appropriate the premises for public uses cannot be regarded as such a right. In one case it was held that the covenant of warranty was not broken by condemnation of the premises to public uses, though the covenantor had, before the execution of the deed, released all claim to damages. The purchaser must also take notice of public statutes restricting the use of the granted premises; and such restrictions continue no breach of the covenant of warranty. Upon a somewhat similar principle, it has been held that the covenant does not extend to the acts of a newly formed State in restricting the ownership of shore proprietors to the line of ordinary high tide, the warranty having been made before the formation of the State when the owner, under the territorial government, was permitted to extend his structures out to navigable depth."

Numerous cases are cited in the notes supporting the above text, among them being Feurer v. Stewart, 83 Fed. 793; Neeson v. Bray, 19 N. Y. S. 841, and Biggs v. Stineway & Sons, 182 N. Y. S. 112. In the latter case it was held that a certain building zone resolution was not an encumbrance on the property involved in that case; that the law authorizing the division of the City into building zones was the exercise of the police power of the State and that all property is subject to such restrictions as the State in its sovereign power may deem necessary for the health, safety and morality of the people. In Barre v. Fleming, 29 W. Va. 314, 1 S. E. 731, it was held that a covenant of warranty in a conveyance of premises extending to low water mark was not broken by the fact that the public had an easement therein, and that the public authorities had enjoined the covenantee from building a wharf below high water mark. In Dobbins v. Brown, 12 Pa. St. 79, it was held that a covenant of warranty does not extend to an entry by au-

thority of the State in the exercise of eminent domain; and among other things in the opinion it said that, "no grantor who warrants the possession dreams that he covenants aaginst the entry of the State to make a railroad or a canal; nor can it be a sound interpretation of the contract that would make him liable for it."

In the light of the statutes and authorities above cited and discussed, we find no error in the ruling of the chancellor, and the order appealed from will accordingly be affirmed. It is so ordered.

Affirmed.

DAVIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.